UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ZEN-NOH GRAIN CORPORATION, | CIVIL ACTION NO. 12-1011 |
| Plaintiff, | SECTION L |
| v. | MAGISTRATE 1 |
| CONSOLIDATED ENVIRONMENTAL MANAGEMENT, INC. – NUCOR STEEL LOUISIANA, | |
| Defendant. | |

**ZEN-NOH GRAIN CORPORATION'S MEMORANDUM
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I.
INTRODUCTION**

Once again, Plaintiff, Zen-Noh Grain Corporation ("Zen-Noh") calls upon this Court to assure that the requirements for the prevention of significant deterioration of air quality in the Clean Air Act, 42 U.S.C. § 7470, *et seq.*, and Louisiana state implementation plan ("SIP"), La. Admin. Code § 33:III.509 (collectively, "PSD"), are met before defendant Nucor Corporation ("Nucor") and its subsidiaries construct an integrated iron and steel manufacturing facility (the "Steel Mill") adjacent to Zen-Noh's grain export elevator in Convent, St. James Parish, Louisiana. Last time, it was to stop the Louisiana Department of Environmental Quality ("LDEQ") from issuing a PSD permit authorizing defendant Consolidated Environmental Management, Inc. ("CEMI") to construct two pig iron manufacturing units until LDEQ complied

{B0571468.1}1

with the public participation requirements.[1]  This time, it is to stop defendants Nucor, CEMI, Nucor Steel Louisiana, LLC ("Nucor Steel") and Nucor Big Iron Holdings, Inc. ("Nucor Big Iron") (collectively, "Defendants") from constructing a particular direct reduced iron ("DRI") manufacturing unit using technology licensed by Tenova HYL ("HYL"), without a required PSD permit.

Only two issues are presented in this motion:  (1) whether Defendants are constructing or propose to construct the HYL process without a required PSD permit, and (2) whether Defendants should be enjoined from constructing the HYL process.  The answer to both questions is yes.

LDEQ issued a PSD permit that authorizes CEMI to construct a different type of DRI process, licensed by Midrex, but the permit explicitly does *not* authorize construction of the HYL process.  LDEQ later issued a permit under the operating permit provisions of the Clean Air Act, 42 U.S.C. § 7661, *et al.*, and La. Admin. Code § 33:III.507 (known collectively, together with 40 C.F.R. Part 70, as "Part 70"), which purports to authorize construction and operation of the HYL process, but the only effect of that permit is to highlight the fact that the PSD permit does not authorize construction of the HYL process.

Zen-Noh will be irreparably harmed if Defendants are allowed to construct and operate the HYL process without a PSD permit, because PSD permit conditions specific to the HYL process likely would be more stringent than the PSD permit conditions based on the Midrex process.  Furthermore, Zen-Noh would be precluded from bringing an immediate enforcement action under 42 U.S.C. § 7604(a)(3) if Defendants subsequently operate the HYL process in

---

[1] That action was dismissed because LDEQ said it had not yet decided whether to issue the PSD permit. *Zen-Noh Grain Corp. v. Harold Leggett, et al.*, Civil Action No. 09-282, 2009 WL 961253 (E.D. La. Apr. 7, 2009).

violation of the Part 70 permit. This harm, and the public interests promoted by PSD, vastly outweigh any harm that might come to Defendants by being required to delay construction until they comply with PSD.

The validity of permits LDEQ *has* issued to authorize construction or operation of equipment other than the HYL process at the Steel Mill are irrelevant to this lawsuit, which focuses solely on a permit LDEQ has *not* issued. In addition, the amount of civil penalties that should be imposed pursuant to 42 U.S.C. §§ 7604(a) and 7413, and an award of costs pursuant to 42 U.S.C. § 7604(e), will be addressed subsequent to resolution of this motion.

## II.
## STATEMENT OF FACTS

In January 2011, LDEQ issued Permit No. PSD-LA-751 (the "PSD Permit").[2] Permit No. 3086-V0 (the "Part 70 Permit"),[3] and a "Public Comments Response Summary."[4] The PSD Permit authorizes CEMI to construct a DRI manufacturing area consisting of two DRI units -- DRI Unit No. 1 and DRI Unit No. 2 -- based on the Midrex process, which uses a reformer and low-pressure furnace to manufacture DRI.[5] The permits identify the reformers as DRI-108 and DRI-208.[6]

During the public comment period, several commenters suggested that LDEQ should require CEMI to construct DRI manufacturing units based on the "reformerless" process licensed

---

[2] The PSD Permit is attached as Exhibit A hereto.

[3] The Part 70 Permit is attached as Exhibit B hereto.

[4] The Public Comments Response Summary is attached, in pertinent part, as Exhibit C hereto. LDEQ also issued Permit No. 2560-00281-V1 on that date, but that permit authorizes operation of a pig iron manufacturing process, not the DRI process at issue in this motion.

[5] Ex. A, pp. 131412-416; Ex. C, pp. 131540-542.

[6] Ex. A, pp. 131375-376, 131412-131416; Ex. B, pp. 131262-263.

by HYL, instead of the Midrex process.[7]  The HYL process uses a process heater instead of a reformer and a high-pressure furnace instead of a low-pressure furnace.[8]

In response to these comments, LDEQ stated that:

> LDEQ received no calculations or process drawings pertaining to a reformerless design.  Permit Nos. 3086-V0 and PSD-LA-751 only authorize construction and operation of the emission units addressed therein; they do not allow Nucor to construct reformerless process units.
>
> . . . The HYL process was considered by Nucor and may result in fewer emissions of greenhouse gases; however, this "process is still experimental and has never been attempted at a DRI facility of the size that Nucor is considering."[9]

LDEQ further responded:

> The commenter is correct in the assertion that the DRI PSD and Part 70 permits do not include an evaluation of the alternate operating scenario presented on the basis of the HYL design. The applicant presented the possibility of an alternate design to the calculations and regulatory analysis presented in the application, in the spirit of full disclosure that design contracts had not been finalized. It was indicated that the calculations and regulatory analysis presented were considered to be the most conservative with respect to the two designs. The applicant has not presented such an alternative design, or indicated whether a final contract has been executed, and is not permitted to construct and operate such an alternative design by the approved PSD and Title V permits.
>
> The additional operating scenario is not required to be submitted because it has been deemed to be "experimental."[10]

The PSD Permit and Part 70 Permit do not include emission limitations or best available control technology ("BACT") determination for emission units associated with the HYL process, including but not limited to a process heater.

After CEMI obtained the DRI PSD Permit, Defendants decided to construct the HYL

---

[7] Ex. C, pp. 131477-478, 131482-485, 131506-507, 131540-542.

[8] *Id.*; *see also* Part 70 Permit Minor Modification Application, attached in pertinent part as Exhibit D hereto, pp. 131850-853.

[9] Ex. C, pp. 131506-507.

[10] *Id.*, pp. 131540-542.

process instead of the Midrex process. CEMI submitted an application to modify the DRI Part 70 Permit, to allow CEMI to construct the HYL process for DRI Unit #1.[11] LDEQ issued Permit No. 3086-V1 (the "Part 70 Modification") in March 2012.[12] LDEQ processed the revision as a "minor modification" and did not issue the revised permit for public comment.[13]

The Part 70 Modification makes changes to reflect the difference between the Midrex process and the HYL process, which include:

1. replacing the DRI Unit No. 1 reformer (Emission Point No. DRI-108), which has a design heat input of 1597 million BTUs per hour ("MMBTU/hr"), with a process heater, which has a design heat input of 1133 MMBTU/hr;

2. deleting the DRI Unit No. 1 upper seal gas vent;

3. removing seal gas emissions from the DRI Unit No. 1 furnace dust collection system;

4. replacing the DRI Unit No. 1 package boiler (Emission Point No. DRI-109), which has a design heat input of 290 MMBUT/hr, with a smaller package boiler, which has a design heat input of 100 MMBTU/hr; and

5. revising emissions from the hot flare.[14]

The Part 70 Modification also reflects shorter stack heights for Emission Point Nos. DRI-108 and DRI-109, which are 213.25 feet high for the reformer and package boiler in the Part 70 Permit but only 164 feet and 82 feet high for the process heater and smaller package boiler in the Part 70 Modification.[15]

---

[11] Ex. D, pp. 131838, 131850-853, 131864.

[12] The Part 70 Modification is attached as Exhibit E hereto.

[13] Ex. E, pp. 131955, 131962.

[14] Ex. B, p. 131262; Ex. E, pp. 131959-960, 131977-979.

[15] Ex. B, p. 131263; Ex. E, p. 131978-979.

The process heater in the HYL process (Emission Point No. DRI-108) will emit 164.74 tons per year of CO alone.[16]

Nucor did not request, and LDEQ did not issue, a revised PSD permit, pursuant to 42 U.S.C. § 7475 and La. Admin. Code § 33:III.509, to reflect the differences between the Midrex and HYL processes. Nucor has commenced construction of at least portions of DRI Unit No. 1 and proposes to construct the entire unit without obtaining a revised PSD permit reflecting the HYL process.[17]

## III.
## ARGUMENT

### A. Summary Judgment Standard.

Under Rule 56 of the Federal Rules of Civil Procedure,

> Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." The moving party bears the burden of establishing that there are no genuine issues of material fact.

*Imperial Trading Co., Inc. v. Travelers Prop. Cas. Co. of Am.*, 638 F. Supp. 2d 692, 693-94 (E.D. La. 2009) (internal citations omitted). The burden then shifts to the nonmoving party to designate "specific facts showing that there is a genuine issue for trial." *Causeway Medical Suite v. Foster*, 43 F. Supp. 2d 604, 610 (E.D. La. 1999). Materiality is governed by the substantive law, and only "'facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

---

[16] Ex. E, pp. 131980-981.

[17] Ex. D, p. 131838.

**B.     Defendants Are Constructing or Propose to Construct the HYL Process DRI Unit No. 1 Without a Required PSD Permit.**

1. The HYL Process Cannot Be Constructed Unless Authorized Under PSD

Defendants do not and cannot dispute that the HYL process may not be constructed without authorization under PSD. The SIP and Clean Air Act prohibit construction of a "major stationary source" unless authorized by a duly-issued PSD permit. La. Admin. Code § 33:III.509.A; 42 U.S.C. § 7475(a)(1).[18] The definition of "major stationary source" includes any iron or steel mill that emits 100 tons per year or more of any regulated air pollutant, including CO, NOx and $PM_{10}$. La. Admin. Code § 33:III.509. B; 42 U.S.C. § 7479(1). Here, the process heater alone in the HYL DRI unit would be a "major stationary source" because it will emit more than 100 tons per year of CO. No matter how Defendants slice the pie, PSD prohibits construction of the HYL process without a PSD permit.

2. The HYL Process Is Not Authorized by the DRI PSD Permit.

According to Defendants, they are authorized to construct the HYL process because the DRI PSD Permit has not been stayed, revoked or rescinded, and the Midrex process authorized by the permit emits more air pollutants than does the HYL process. (Answer, ¶¶ 8, 10, 12-14.) There are two problems to Defendants' position. First, the plain language of the record indicates that LDEQ did not authorize construction of the HYL process. The Public Comments Response Summary explicitly and repeatedly states that the PSD Permit does not allow CEMI to construct "reformerless process units" because LDEQ did not receive any calculations or process drawings pertaining to the "experimental" HYL process. LDEQ's intention is reflected in the terms of the PSD Permit, which makes no mention of the HYL process, in general, or specific HYL process

---

[18] The CAA uses the term "major emitting facility" instead of "major stationary source," but the threshold definition is identical to the SIP.

equipment, such as the process heater. Moreover, an important purpose of PSD is to assure that any PSD permit decision be made "only after careful evaluation of all the consequences of such decision and after adequate procedural opportunities for informed public participation in the decisionmaking process." 42 U.S.C. § 7470(5). It would defy this purpose to find that LDEQ inadvertently or surreptitiously authorized construction of the HYL process. LDEQ did neither, as the record reflects.

Second, regardless of LDEQ's intentions, PSD permits are not general permits or "one size fits all." A PSD permit does not authorize construction of an emissions unit -- e.g., the process heater or high-pressure DRI furnace -- unless the PSD permit sets forth BACT requirements specific to the emission unit. La. Admin. Code §§ 509.A.3 and 509.J; *United States v. EME Homer City Generation, L.P.*, 823 F. Supp. 2d 274, 281 (W.D. Pa. 2011) (citing 42 U.S.C. §§ 7475(a)(1) and 7475(a)(4)); *see* New Source Review Workshop Manual ("NSR Manual"), Oct. 1990, p. H.5, available at http://www.epa.gov/region07/air/nsr/nsrmemos/1990wman.pdf, last visited June 16, 2012 (technical specifications identifying the type, size and capacity of equipment "may be considered the core of the permit"). The applicant must construct the emissions unit with the required control equipment and in accordance with the specifications and design submitted to LDEQ. La. Code §§ 33:III.509.N.1 and 509.R.1.

The permit must also demonstrate that the proposed emissions will not cause a violation of any national ambient air quality standard ("NAAQS"). La. Admin. Code § 509.K; 42 U.S.C. § 7475(a)(3). Among other things, the dispersion modeling used to make this demonstration depends upon the stack height, diameter, temperature, and flow rate or exit velocity for each emissions unit. *See* 40 C.F.R. Part 52, App. W, § 8.1.2. The Clean Air Act prohibits

construction of emission units that were not presented in the PSD permit application and considered in the air quality impact analysis. *Save the Valley, Inc. v. Ruckelshaus*, 565 F. Supp. 709, 710-11 (D.D.C. 1983) (questioned on other grounds by *Sierra Club v. Jackson*, 724 F. Supp. 2d 33, 40(D.D.C. 2010)).   And, the public must be given an opportunity to review and comment on the BACT determinations and air quality impact analyses before the PSD permit is issued.  La. Admin. Code § 33:III.509.Q ; 42 U.S.C. §7475(a)(2).

In *Save the Valley*, the applicant obtained PSD permits to construct four power generating units, but the permits for three of the units were withdrawn.  565 F. Supp. at 710.  Nonetheless, the applicant commenced construction of foundations, structures and ancillary equipment for the unpermitted units and common areas that would serve all four units.  The citizens' group initiated a citizens suit under 42 U.S.C. § 7604 to block the unpermitted construction.  The court concluded that the issue is governed by the pollution control aims of PSD and the plain language of 42 U.S.C. § 7475(a)(3), which requires an applicant to demonstrate that "emissions from construction or operation of such facility will not cause, or contribute to, air pollution."  The court held that the only reading of the statute that would give effect to its manifest purpose is to prohibit "any construction not specifically presented and approved during the permit process." *Id.* at 710-11.[19]

Here, like the applicant in *Save the Valley*, Defendants are constructing or propose to construct emission units that are not authorized by the PSD Permit.  The PSD Permit and Part 70 Permit do not include any emission limitations or BACT determinations for the process heater or high-pressure DRI furnace employed by the HYL process, and, in fact, do not even mention this

---

[19] The court further held that EPA has a duty to prevent unpermitted construction, but other cases have questioned whether this is duty is non-discretionary.  *See Sierra Club v. Jackson*, 724 F. Supp. 2d at 40.

equipment. The PSD Permit also does not demonstrate specifically that emissions from the HYL process will not cause an NAAQS violation. For example, DRI-108 and DRI-109 would emit from stacks that are 213.5 feet tall according to the Part 70 Permit, but the same emission points would emit from stacks that are only 164 feet and 82 feet tall according to the Part 70 Modification. Zen-Noh had a right, and would like to have had an opportunity, to review and comment on an air quality impact analysis based on the shorter stack heights in the HYL process. To say that the PSD Permit nonetheless permitted the HYL process would defeat the purpose of PSD. *See Save the Valley*, 565 F. Supp. at 710-11.

In sum, there can be no dispute that Defendants are constructing the HYL process without the authorization required under La. Admin. Code §33:III.509.A and 42 U.S.C. § 7475(a).

### C. Zen-Noh Is Entitled to Entry of an Order Permanently Enjoining Defendants from Constructing DRI Unit No. 1 Until They Receive a PSD Permit Specifically Authorizing Construction of the HYL Process.

A party seeking a permanent injunction must establish: "(1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *O'Connor v. Smith*, 427 Fed. Appx. 359, (5th Cir. 2011). In cases involving violations of the Clean Air Act, courts routinely balance the interests with "particular regard" for the public interests protected by the Clean Air Act. *St. Bernard Citizens for Environmental Quality, Inc. v. Chalmette Refining, LLC*, 399 F. Supp. 2d 726, 736 (E.D. La. 2005) (citing *Amoco Prod. Co. v. Village of Gambrill,* 480 U.S. 431, 542 (1987)); *Sierra Club v. Franklin County Power of Illinois, LLC*, 546 F.3d 918, 935-37 (7th Cir. 2008).

In *Franklin County Power*, the district court granted summary judgment enjoining

construction of a power plant with an expired PSD permit. The Seventh Circuit Court of Appeals affirmed, holding that given the district court's conclusion that the PSD permit had expired, and the prohibition in 42 U.S.C. § 7475(a)(1) against construction of a major emitting facility without a valid PSD permit, the utility had "no option but to obtain this permit before it can commence construction." 546 F.3d at 935. The court of appeals also held that the injunctive relief factors favored an injunction. If the utility were allowed to construct the power plant, plaintiffs likely would suffer an irreparable injury because a new PSD permit likely would contain more stringent standards than the expired permit, and money damages generally cannot remedy environmental injuries. *Id.* (citing *Amoco*, 480 U.S. at 542, 545). The balance of harms favored an injunction because the only cost to the utility would be delayed construction while it obtained a PSD permit. *Id.* at 935-36. Last, requiring the utility to obtain a valid PSD permit before constructing the power plant "would further a stated goal of the Clean Air Act." *Id.* at 936-37 (citing 42 U.S.C. §7401(b)(1)).

Here, as described above, Zen-Noh has established actual success on the merits, i.e. that Defendants are constructing or propose to construct the HYL process without the authorization required under La. Admin. Code § 33:III.509 and 42 U.S.C. § 7475(a). The remaining elements further support issuance of a permanent injunction.

      1.    <u>Zen-Noh Will Be Irreparably Harmed if Injunctive Relief Is Denied.</u>

Defendants' failure to obtain a PSD permit with BACT determinations and emission limitations specific to the HYL process will irreparably harm Zen-Noh in at least two ways. First, as in *Franklin County Power*, there is good reason to believe that a PSD permit for the HYL process would impose more stringent requirements than the PSD Permit does for the Midrex process. For example, the PSD Permit includes BACT determinations and maximum

allowable emission rates for the low pressure DRI furnace (DRI-107), reformer (DRI-108) and package boiler (DRI-109).[20] It also incorporates, by reference, the terms and conditions in the Part 70 Permit for these sources.[21] The Part 70 Permit has emission limitations for these sources. The Part 70 Modification also includes emission limitations, including for the high pressure DRI furnace (DRI-107), process heater (DRI-108) and package boiler (DRI-109).[22] The table below compares the CO and $PM_{10}$ emission limitations for these emission point ID numbers in the two permits:

| Permit No. 3086-V0 | | | Permit No. 3086-V1 | |
|---|---|---|---|---|
| CO (tons/yr) | $PM_{10}$ (tons/yr) | Emission Point | CO (tons/yr) | $PM_{10}$ (tons/yr) |
| 2.71 | 2.92 | DRI-107 | -- | 2.24 |
| 236.86 | 37.90 | DRI-108 | 164.74 | 24.98 |
| 41.54 | 8.60 | DRI-109 | 12.48 | 0.21 |

In every case, permitted emissions from the HYL process are lower than the corresponding emissions from the Midrex process. Indeed, DRI-107 is not even allowed to emit any CO in the HYL process. If CEMI had submitted calculations and process drawings pertaining to the HYL process before LDEQ issued the PSD Permit, and if LDEQ had decided to authorize construction of the HYL process at that time, these -- or similarly -- more stringent emission limitations would have been incorporated into the PSD Permit.

This did not happen, however, and Zen-Noh (and the public) will be harmed as a result. Part 70 permits do not add new federally enforceable emission limitations; rather, they are intended merely to aggregate in one place all the federally enforceable requirements that are

---

[20] Ex. A, pp. 131412-416.
[21] *Id.*, n. 6.
[22] Ex. E, p. 131980-982.

impose elsewhere, such as in a PSD permit.  *See, e.g.*, *Sierra Club v. Portland General Electric Co.*, 663 F. Supp. 2d 983, 989 (D. Or. 2009).  In other words, there would be no remedy under the Clean Air Act if Defendants operate the HYL process in violation of the Part 70 Modification but in compliance with the emission limitations in the PSD Permit.

Even if the emission limitations in the Part 70 Modification are federally enforceable, Zen-Noh will lose its due process rights under 42 U.S.C. § 7604(a)(3).  Congress provided two distinct causes of action for citizen s wishing to enjoin violations of the Clean Air Act.  In § 7604(a)(3), Congress authorized citizens to take immediate action to stop construction, or proposed construction, without a required PSD permit.  On the other hand, when a source violates an emission limitation or condition that appears only in a Part 70 permit, Congress required citizens to provide notice to EPA, and wait sixty days, before commencing an action to enjoin the violation.  42 U.S.C. §§ 7604(a)(1) and (b)(1).  This distinction reflects a determination that the potential harm caused by violating PSD does not warrant any delay.

Here, emission limitations for the HYL process appear only in the Part 70 Modification.  If an emissions unit in DRI Unit No. 1 violates an emission limitation in the Part 70 Modification, the neighbors (including Zen-Noh) may be forced to suffer excess emissions for sixty days before commencing an action under § 7604(a)(1) to enjoin the violations.  If Defendants are required to obtain a PSD permit with BACT determinations and emission limitations specific to the HYL process, § 7604(a)(3) will allow the neighbors to take immediate action to enjoin the same excess emissions.  This potential extended exposure to excess emissions is an irreparable environmental harm.  *See Franklin County Power*, 546 F.3d at 918.

2. <u>The Balance of Harms and Public Interest Favor an Injunction.</u>

The purposes of PSD are explicit, and include:  (1) to protect public health and welfare

from any actual or potential adverse effect which . . . may reasonably be anticipated to occur from air pollution . . . (3) to insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources . . . and (5) to assure that any decision to permit increased air pollution in any area to which [PSD] applies is made only after careful evaluation of all the consequences of such decision and after adequate procedural opportunity for informed public participation in the decisionmaking process." 42 U.S.C. § 7470.

These public interests demand that Defendants be enjoined from constructing DRI Unit No. 1. There was no "careful evaluation of all the consequences" of the HYL process before LDEQ issued the PSD Permit because CEMI did not submit any calculations or process drawings pertaining to that process. For the same reason, the public did not get an opportunity to review and comment on the air quality impacts from the HYL process. Last, a PSD permit that does not include BACT determinations, emission limitations, or an air quality impact analysis for the HYL process, cannot "protect public health and welfare from any actual or potential adverse effect" which might occur from the HYL process emissions.

These public interests should be given "dominant weight," and alone outweigh Defendants' interest in continuing to violate PSD. *Amoco Prod. Co.*, 480 U.S. at 542. Coupled with the harm that will befall Zen-Noh if Defendants are not enjoined, the public interests far outweigh any possible effect on Defendants if they are required to delay construction until they obtain a PSD permit for the HYL process. As in *Franklin County Power*, Defendants will not suffer a legally cognizable harm if they are enjoined from constructing DRI Unit No. 1 without a PSD permit specifically authorizing the HYL process because the Clean Air Act and SIP prohibit Defendants from doing so. In other words, Defendants have "no option but to obtain this permit before [they] can commence construction." *Franklin County Power*, 546 F.3d at 935.

## IV.
## CONCLUSION

For all the foregoing reasons, Zen-Noh is entitled to entry of an order declaring that Defendants are constructing or propose to construct the HYL process-based DRI Unit No. 1 without a required PSD permit, in violation of 42 U.S.C. §7475(a)(1) and La. Admin. Code §33:III.509.A, and enjoining Defendants from commencing or continuing construction of emission units in DRI Unit No. 1 until such time as LDEQ issues a PSD permit, in accordance with 42 U.S.C. §7475(a) and La. Admin. Code § 33:III.509, specifically authorizing construction of the HYL process.

.

Respectfully submitted,

BALDWIN HASPEL BURKE & MAYER LLC

s/J. Michael Bowman
PAUL N. VANCE, T.A. (#13007)
JAMES G. BURKE, JR. (#3676)
J. MICHAEL BOWMAN (Indiana Atty. # 24804-49)
1100 Poydras Street
Suite 3600
New Orleans, LA 70163
pvance@bhmblaw.com
jburke@bhbmlaw.com
mbowman@bhbmlaw.com
Telephone: 504.569.2900
Facsimile: 504.569.2099

Attorneys for Zen-Noh Grain Corporation

## CERTIFICATE OF SERVICE

The undersigned certifies that copies of the foregoing have been served on all attorneys of record via the court's CM/ECF system on June 21, 2012.

s/ J. Michael Bowman