UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ZEN-NOH GRAIN CORPORATION                    CIVIL ACTION

VERSUS                                       NO: 12-1011

CONSOLIDATED ENVIRONMENTAL                   SECTION: R(1)
MANAGEMENT, INC. - NUCOR
STEEL LOUISIANA

## ORDER AND REASONS

Plaintiff Zen-Noh Grain Corp. filed this action to enjoin defendants, Consolidated Environmental Management, Inc. ("CEMI"), Nucor Corporation ("Nucor"), Nucor Big Iron Holdings, Inc. ("Nucor Big Iron"), and Nucor Steel Louisiana, LLC ("Nucor Steel") from constructing a proposed direct reduced iron ("DRI") manufacturing plant in St. James Parish.  Zen-Noh alleges that the requirements of the Clean Air Act ("CAA") and the federally enforceable Louisiana State Implementation Plan have not been met with regards to Defendants' proposed unit one of the plant.  Zen-Noh has filed a motion for summary judgment.[1]

The crux of Zen-Noh's argument is that the construction permit issued to defendants by the Louisiana Department of Environmental Quality ("LDEQ") authorizes a manufacturing unit using a different type of DRI technology than defendants now plan to use.  A Prevention of Serious Deterioration of air quality ("PSD") permit must authorize the construction of unit one under the CAA.  In this case, the only PSD permit that has been issued

---

[1] R. Doc. 25-1.

for the unit specified use of the Midrex process, which defendants have since abandoned.  Instead, they have begun construction of a plant that utilizes a different type of technology licensed by HYL, not authorized or mentioned in the PSD permit.

Defendants argue that the suit is unripe for adjudication because the permit in question has been reopened for reconsideration by LDEQ and a final revised permit has not yet been issued.  They also argue that a permanent injunction is not warranted because the reopening of the permit alleviates all of the harms of which plaintiff complains.  Although Zen-Noh raises serious concerns regarding CEMI's compliance with the PSD program in constructing the DRI plant, LDEQ's reopening of the permit avoids the possibility of harm to Zen-Noh and renders the suit unripe.  Because the dispute is not ripe for adjudication, the Court DENIES the motion for summary judgment.

I.   **STATUTORY BACKGROUND**

Congress enacted the CAA "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401(b)(1).  The Act is a comprehensive program for controlling and improving the nation's air quality. Under the Act, the Administrator of the Environmental Protection Agency identifies air pollutants that endanger the public health or welfare, determines what concentrations of those pollutants

are safe, and codifies those safety determinations as National Ambient Air Quality Standards ("NAAQS"). *See* 42 U.S.C. §§ 7408, 7409.  The Act then delegates to the states "primary responsibility for assuring air quality" within their respective boundaries, and requires each state to develop a State Implementation Plan "which will specify the manner in which [the NAAQS] will be achieved and maintained." 42 U.S.C. § 7410(a). Upon approval by the EPA, a State Implementation Plan becomes federally enforceable law. *Louisiana Envtl. Action Network v. EPA*, 382 F.3d 575, 579 (5th Cir. 2004); *Kentucky Res. Council, Inc. v. EPA*, 304 F. Supp. 2d 920, 923 (W.D. Ky. 2004); *Sweat v. Hull*, 200 F. Supp. 2d 1162, 1164 (D. Ariz. 2001).

Although the states "have 'wide discretion' in formulating their plans," *Alaska Dept. of Environmental Conservation v. EPA*, 540 U.S. 461, 470 (2004)(quoting *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976)), the CAA mandates that all State Implementation Plans include certain features.  Of relevance here, the Act provides that each State Implementation Plan shall "meet the applicable requirements" of what is known as the Prevention of Significant Deterioration of Air Quality ("PSD") program. 42 U.S.C. § 7410(J); *see also* 42 U.S.C. § 7471.  The PSD program, which applies to areas where the ambient level of air pollution already meets the NAAQS, *see* 42 U.S.C. § 7471, was "designed to ensure that the air quality in attainment areas or areas that are

3

already 'clean' will not degrade." *Alaska Dept. of Environmental Conservation*, 540 U.S. at 470 (quoting BELDEN, CLEAN AIR ACT 43 (2001)).  It prescribes certain substantive and procedural requirements that must be met before construction may begin on a new "major emitting facility." *See* 42 U.S.C. §§ 7475, 7479(1). The PSD review process requires a demonstration that "emissions from construction or operation of such facility will not cause, or contribute to, air pollution" above the maximum allowable increment for the local air quality area, the national ambient air quality standards (NAAQS), or any other applicable emission standard. *Id*. § 7475(a)(3).  A critical requirement of the PSD application review process is a determination that the proposed facility will be outfitted with the best available control technology ("BACT")[2] for pollutants. 42 U.S.C. § 7475(a)(4).  The restrictions on emissions included in a PSD are based on the determination of BACT. *Id*.

Although the PSD program relates to preconstruction permits, Title V of the CAA deals with operating permits. 42 U.S.C. §§ 7661–7661f.  As with the PSD program, Louisiana has a corresponding Title V operating permit program (also known as the

---

[2] "BACT, is defined in the CAA as "an emission limitation based on the maximum degree of [pollutant] reduction ... which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for [the] facility ...." 42 U.S.C. § 7479(3).

Part 70 Permit program). LAC 33:III Chapter 5.  Part 70 does not set forth any new requirements for source operators; it is designed to have all emissions limitations and applicable PSD provisions (such as BACT) in one easily accessible location.  It is unlawful to operate without a Part 70 operating permit or to operate except in compliance with an operating permit issued under Part 70.  The PSD and Part 70 permit programs are incorporated into Louisiana rules under Louisiana Administrative Code title 33, part II, Ch. 5 ("Louisiana SIP"), which has been approved as satisfying the requirements of the CAA, 42 U.S.C. § 7411 *et seq.*  All parties agree that the PSD and Part 70 requirements apply to the proposed DRI plant at issue in this litigation.

The CAA contains three citizen suit provisions.  One of the provisions allows for suit against the EPA Administrator "where there is alleged a failure of the Administrator to perform a duty under" the CAA. *Id.* § 7604(a)(2).  The other two provisions allow suit in federal district court against any person who is alleged to have violated an emission standard of the CAA.  Section 7604(a)(3) allows for immediate suit against someone who is alleged to be constructing or operating a major source of emissions without or in violation of a PSD permit.  Section 7604(a)(1) allows suit based on a range of CAA violations, including violation of PSD permits, Part 70 permits, and the

5

NAAQS.  Although a 7604(a)(3) action can be brought immediately, suit under the broader 7604(a)(1) requires that the plaintiff give 60 days notice to the EPA Administrator, to the State in which the violation occurs, and to any alleged violator of the standard, limitation, or order. *Id.* § 7604(b)(1)(A).

## II.  FACTUAL BACKGROUND

This case is related to an earlier suit filed in this court which sought to enjoin LDEQ from issuing a PSD permit to CEMI for a pig iron manufacturing facility at the St. James Parish site. Because LDEQ had not yet issued the permit, the Court dismissed the suit as unripe.  The instant matter involves the DRI facility and not the pig iron facility at issue in the previous suit.  The proposed DRI facility will consist of two DRI units, each of which qualifies as a "major emitting facility" for which a PSD permit and a Part 70 permit are required.

On August 20, 2010, CEMI first applied for PSD and Part 70 permits for the DRI plant.[3]  In its initial application CEMI indicated that it planned to use a DRI process which incorporates an external reformer, such as the Midrex process.  The applications included calculations and process drawings pertaining only to the Midrex process.  CEMI also explained in

---

[3] LDEQ received the initial application on August 20, 2010. After twice receiving additional information for CEMI, LDEQ considered the application effectively complete on November 8, 2010. R. Doc. 25-2 at 9.

6

the Part 70 permit application that it was considering a

reformerless process:

> Nucor is investigating the potential of a DRI process
> which does not require a reformer as part of the
> design. In the place of the reformer, a process heater
> provides the energy input necessary to heat the
> furnace, which requires less heat input than a standard
> reformer design. However, this technology remains
> unproven, and new units based on this design have yet
> to be built. Nucor reserves the right to select and
> implement this competing technology at the Nucor Direct
> Reduced Iron Facility after a thorough investigation of
> its potential and reliability. Due to the lower energy
> requirements claimed by the vendor, it is expected that
> emissions from a reformerless DRI unit would be lower
> than that of a standard design including a reformer,
> and so the emissions presented with this application
> are conservative. Nucor will notify the Louisiana
> Department of Environmental Quality in a timely manner
> of the DRI process design selection made for the Nucor
> Direct Reduced Iron Facility.[4]

The alternative design described above is referred to by the

parties as the HYL process.

Following receipt of the permit applications, LDEQ provided

an opportunity for public comment on the permits as required by

the Louisiana SIP. La. Admin Code. tit. 33, pt. III, 509Q.

Several comments questioned the choice between the HYL reformer-

less technology and the Midrex process.  One comment stated:

> The original October 2010 application states that Nucor
> is requesting authorization to construct a reformer-
> based DRI plant, but is also seeking authority to
> construct in the alternative, a reformer-less HYL
> process unit.  We did not see this other process
> discussed in the draft PSD permit, [or] Title V permit.

---

[4] R. Doc. 29 at 3.

7

> Please clarify whether this inherently less polluting process was considered in the Best Available Control Technology (BACT) determination.[5]

LDEQ responded:

> LDEQ received no calculations or process drawings pertaining to a reformerless design. Permit Nos. 3086-V0 [Part 70] and PSD-LA-751 [PSD] only authorize construction and operation of the emissions units addressed therein; they do not allow Nucor to construct reformerless process units.
>
> The HYL process was considered by Nucor and may result in fewer emissions of greenhouse gases; however, this process is still experimental and has never been attempted at a DRI facility of the size that Nucor is considering.[6]

In response to similar comments, LDEQ reiterated that "[t]he applicant has not presented such an alternative design, ... and is not permitted to construct and operate such an alternative design by the approved PSD and Title V permits,"[7] and "PSD-LA-751...do[es] not allow Nucor to construct reformerless process units."[8]

On January 27, 2011, LDEQ issued PSD and Part 70 permits for the construction and operation of the two DRI plants.[9]  The PSD

---

[5] R. Doc. 25-4 at 56-57.

[6] *Id.* (quotations omitted).

[7] *Id.* at 191.

[8] *Id.* at 28.

[9] R. Doc. 25-2; R. Doc 25-3.

8

permit contained a multi-step analysis determining the BACT for each regulated pollutant, a summary table of the selected BACT for each pollutant, and maximum allowable emission rates based on the BACT determinations.[10]

Subsequently, CEMI decided to construct the first of the two DRI plants utilizing the new technology licensed by HYL. On September 29, 2011, CEMI submitted an application with LDEQ to modify its Part 70 permit in accordance with the changed plans.[11] Both parties acknowledge that the HYL process is likely to be more efficient and have lower emissions than the Midrex process.[12] The primary difference in the HYL technology is that natural gas is reformed internally, rather than externally, as in the Midrex process. As CEMI explains:

> External reforming is accomplished via a process heater containing catalyst in the heater tubes while the in situ [internal] reforming utilizes a smaller process heater (still external) which simply heats the natural gas in the heater tubes without the catalyst; the natural gas reforming reaction occurring later in the process or "in situ" with the iron ore raw material in the shaft furnace.[13]

---

[10] R. Doc. 25-2 at 11-72, 78-81.

[11] R. Doc. 25-5; R. Doc. 29 at 4.

[12] R. Doc. 29 at 15; R. Doc. 25-1 at 12.

[13] R. Doc. 33-5.

The HYL process "substitutes in place of the reformer a process heater with a lower firing rate, and allows for the substitution of a smaller package boiler than that required by the traditional process."[14]

On March 8, 2012, LDEQ issued a modified Part 70 permit authorizing the construction and operation of the unit with the HYL process.[15]  The modified part 70 permit wholly adopted the changes and limitations proposed by CEMI in its application for the modification.  The changes to the permit included replacing the reformer with a process heater, which has a lower heat input, and replacing the package boiler with a smaller one with a lower heat input.  The emissions limits for four emissions points, the furnace dust collection (DRI-107), the process heater (DRI-108), the package boiler flue stack (DRI-109), and the hot flare (DRI-110) were changed.[16]  Limits for the first three emission points demonstrated substantial reductions for most of the criteria pollutants, while the hot flare emissions limits mostly increased.[17]  LDEQ classified the modification of the Part 70

---

[14] R. Doc. 25-5 at 1-2.

[15] R. Doc. 25-6.

[16] Compare R. Doc. 25-3 at 23, with R. Doc. 25-6 at 27.

[17] *Id.*

permit as a "minor modification," for which public notice was not required.[18]

Because the Part 70 permit program is designed to be an accumulation of all the emissions limitations associated with a facility, in considering the Part 70 modification LDEQ evaluated its compliance with the PSD program along with Louisiana Air Quality Regulations, New Source Performance Standards, and National Emission Standards for Hazardous Air Pollutants.[19] The parties dispute whether LDEQ considered actually modifying the PSD permit when it evaluated the Part 70 modification. Plaintiff alleges that "Nucor did not request, and LDEQ did not issue, a revised PSD permit...to reflect the differences between the Midrex and HYL process."[20] Defendants point to LDEQ's statements issued after the Part 70 modification that it reviewed the PSD permit and determined that modification was unnecessary because the initial BACT determinations were unchanged.[21]

In early 2012, CEMI allegedly began construction of the HYL DRI unit with the new technology and the original PSD permit

---

[18] R. Doc. 25-6 at 6.

[19] *Id.*

[20] R. Doc. 25-1 at 6.

[21] R. Doc. 29-1 at 1.

still in place.[22]  Zen-Noh sought to enjoin construction of the unit on April 20, 2012.[23]  Zen-Noh filed a motion for summary judgement on June 21, 2012.[24]

Also on June 21, 2012, LDEQ decided to reopen the PSD permit.  In a letter announcing the reopener, LDEQ stated:

> At the time [of the Part 70 modification], LDEQ also reviewed the PSD permit for the DRI facility, PSD-LA-751, to determine if it should be modified in the same fashion. Despite being aware of previous statements that the PSD permit did not allow Nucor to construct reformerless process units, based on LDEQ's review of the application and inquiries about the HYL design, LDEQ concluded that because its initial best available control technology (BACT) determinations remained appropriate, it was not necessary to modify this permit.[25]

Nevertheless, LDEQ said that the degree of public interest in the project prompted its decision to reopen the permit "for the limited purpose of confirming LDEQ's initial assessment."[26]  In reopening the permit, LDEQ called for CEMI to submit an analysis demonstrating that "BACT for the HYL equipment is not more stringent than that provided by PSD-LA-751, and ... [the] use of

---

[22] CEMI's application for modification of the Part 70 permit, dated September 29, 2011 stated that "Nucor has recently commenced construction of the permitted facility, and expects to begin operations in 2013."  R. Doc. 25-5 at 2.

[23] R. Doc. 1.

[24] R. Doc. 25-1.

[25] R. Doc 29-1 (quotations omitted).

[26] *Id.*

HYL equipment in one unit of the DRI facility does not materially change the original air quality analysis."[27]  Alternatively, LDEQ invited CEMI to identify and justify any necessary revisions to the existing PSD permit.  The reopener stated:

> If LDEQ ultimately determines that no changes to the existing BACT determinations are warranted, PSD-LA-751 will be revised to clarify that it covers the HYL equipment. If LDEQ determines that BACT for the HYL equipment is more stringent than that currently provided by the PSD permit, or that use of HYL equipment in one unit of the DRI facility results in adverse air quality impacts, LDEQ will stay the permit or portions of the permit as necessary and propose a revised permit establishing appropriate terms and conditions.[28]

LDEQ also announced an opportunity for public comment on the reopened permit:

> In accordance with LAC 33:III.529.A.2, proceedings to reopen a permit shall affect only those parts of the permit for which cause to reopen exists. Therefore, public comment shall be limited solely to the issues addressed herein and to any other revisions to the permit proposed by LDEQ.[29]

After reopening the PSD permit and receiving the requested analysis from CEMI, LDEQ issued a draft modified PSD permit for public comment.[30]  In the draft, LDEQ reiterated that at the time

---

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] R. Doc. 33-5 (Draft PSD-LA-751(M-1)).

13

LDEQ approved CEMI's application and modified the Part 70 permit, "LDEQ also reviewed the PSD permit...to determine if it should be modified in the same fashion."[31]  "LDEQ concluded that because its initial...BACT determinations remained appropriate, it was not necessary to modify the PSD permit."[32]  The draft PSD permit stated:

> Based upon additional information provided by Nucor on July 20, 2012, LDEQ has again concluded that no changes to the existing BACT determinations are warranted...and that use of in situ reforming equipment in one unit of the DRI plant does not result in adverse air quality impacts.  Therefore LDEQ proposes to revise the PSD-LA-751 only to clarify that it covers the in situ reforming equipment.[33]

The draft of the modified PSD permit laid out the top down BACT process for determining the most stringent control technique for each emission point.  The draft "replicate[d] the [BACT] analysis documented in PSD-LA-751 [the original PSD permit], modified to reflect that DRI Unit No. 1 will be an in situ reforming design."[34]  Unlike the earlier Part 70 modification which was classified as a minor modification, the PSD draft indicated that the LDEQ "has made a

---

[31] *Id.* at 2

[32] *Id.* at 3.

[33] *Id.*

[34] *Id.* at 9.

preliminary determination to approve the construction of the *major* modification."[35]

The changes in design led to some differences in the BACT analysis and emissions limits for the HYL unit (in the Draft revised permit) compared to the analysis in the original PSD permit.  For example, the BACT analysis of the DRI reformer was removed and replaced by BACT analysis for the Process Heater.[36]  In its submissions to LDEQ for consideration in the reopener, CEMI stated:

> The only difference [between the Midrex and HYL designs] is where the natural gas reformer is located and the impact that the type of reformer has on the overall process emissions. ...[The HYL] unit has 15 emission points for which BACT was evaluated.  All but five of these remain identical for either type of natural gas reforming. Consequently, the BACT evaluation for these emission points also remains unchanged. The remaining five emission points are slightly different depending on whether an in situ or external reformer is utilized on the DRI plant.[37]

The briefing sheet of the draft permit provided a summary of the changes including: 1) replacement of the reformer with a process heater; 2) reduction of the PM10/PM2.5 BACT limit for the new Process Heater; 3) deletion of the upper seal gas vent; 4) removal of seal gas emissions from the furnace

---

[35] *Id.* at 7 (emphasis added).

[36] R. Doc. 33-5 at 116.

[37] *Id.* at 112.

dust collection; 5) lowering of the firing rate of the package boiler; and 6) revision of the emissions limitations for the hot flare to reflect that the flare will now be used only for startup and shutdown operations rather than intermittently.[38]  Also, the generally more stringent emissions limits from the Part 70 permit modification were included in the PSD draft.

A final PSD permit authorizing the HYL changes has not yet been issued.  Nevertheless, the language in the draft permit and the representations of defendants at oral argument suggest that the LDEQ will at some point issue a final PSD permit similar to the draft.  The Court has taken judicial notice of the fact that the period for public comment on the proposed reopened PSD permit concluded on October 8, 2012.[39]

Zen-Noh asks this court to enjoin the ongoing construction of the plant until a final PSD permit authorizing the HYL process

---

[38] *Id.* at 7.

[39]  Pursuant to Federal Rule of Evidence 201(B), a court may take judicial notice of adjudicative facts that are not subject to reasonable dispute, either because they are (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed.R.Evid. 201(b).  The Court determined the deadline for public comment by reference to LDEQ's Public Notice of the proposed reopened PSD Permit and the subsequent notice extending the period due to Hurricane Isaac.

is granted.  Zen-Noh contends that "Nucor has commenced construction of a different type of DRI manufacturing process, the 'HYL' process, which is not permitted at all under [CEMI's existing] PSD".[40]  CEMI contends that the reopening of the permit application by LDEQ renders this suit unripe because the relevant state agency has yet to make a final permitting determination.  CEMI also argues that there will be no irreparable harm in the absence of an injunction.

## II.  STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo*

---

[40]  R. Doc. 7 at 2.

*v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985);
*Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party
will bear the burden of proof at trial, the moving party "must
come forward with evidence which would 'entitle it to a directed
verdict if the evidence went uncontroverted at trial.'" *Int'l
Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th
Cir. 1991).  The nonmoving party can then defeat the motion by
either countering with sufficient evidence of its own, or
"showing that the moving party's evidence is so sheer that it may
not persuade the reasonable fact-finder to return a verdict in
favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party
will bear the burden of proof at trial, the moving party may
satisfy its burden by merely pointing out that the evidence in
the record is insufficient with respect to an essential element
of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325.
The burden then shifts to the nonmoving party, who must, by
submitting or referring to evidence, set out specific facts
showing that a genuine issue exists. *See id.* at 324.  The
nonmovant may not rest upon the pleadings, but must identify
specific facts that establish a genuine issue for trial. *See,
e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith ex rel.
Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir.

1988), *cert. denied*, 488 U.S. 926 (1988).  Although a nonmovant's failure to respond to a motion for summary judgment does not permit the entry of a "default" summary judgment, the court may accept the movant's evidence as undisputed. *Eversley v. Mbank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988).

## III. DISCUSSION

Defendants argue that the suit should be dismissed on the ground that Zen-Noh's claims are not yet ripe for adjudication. Ripeness is a constitutional justiciability doctrine that "prevent[s] the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580 (1985)(quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977)). Ripeness doctrine directs against deciding cases which are abstract or hypothetical, as opposed to definite and concrete. *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir.2003).  The Supreme Court has expressly recognized that one purpose of the doctrine is "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories*, 387 U.S. at 148-49.

In determining whether a claim is ripe for adjudication, courts are to refer primarily to the "the fitness of the issues

for judicial decision and the hardship to the parties of withholding court consideration. *Abbott Laboratories*, 387 U.S. at 149.  In making this determination, "the court should evaluate three factors: (1) whether delayed review would cause hardship to the plaintiff; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 244-45 (5th Cir. 2006)(citation and quotations omitted).  "[A] case is generally ripe if any remaining questions are purely legal ones." *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007)(quoting *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987)).  On the other hand, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998)(citation and internal quotation marks omitted).

     In considering ripeness, events that occurred after the filing of the complaint can be considered. *See* 13B CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 3532.7 (3d ed. 2008); *See also Buckley v. Valeo*, 424 U.S. 1, 113-114 (1976) ("Ripeness questions are peculiarly questions of timing, and could properly be resolved by considering events,...that

20

intervened between consideration by the court of appeals and decision by the Supreme Court"). "[I]t is irrelevant whether the case was ripe for review when the complaint was filed." *American Motorists Ins. Co. v. United Furnace Co., Inc.*, 876 F.2d 293, 302 n. 4 (2d Cir. 1989), citing WRIGHT ET AL. "Intervening events relevant to the ripeness inquiry should be considered and may be determinative." *Id.*

Turning to first consideration identified by the Fifth Circuit in *Coliseum Square*, the Court finds no hardship to the parties of withholding court consideration. In its briefs, Zen-Noh does not directly discuss ripeness. But its position on the issue is clear: the case is fit for adjudication because regardless of future agency action, the ongoing construction of the HYL plant is impermissible and should be enjoined.[41] Nevertheless, with operation of the plant still months away, plaintiff fails to demonstrate that any hardship would result from withholding adjudication until the agency proceedings are finished.

In its motion for summary judgment, Zen-Noh argued that if plant operation begins under the existing PSD permit and emissions are above HYL BACT limits but below Midrex levels, it will have to wait 60 days to file an action for relief under §

---

[41] *See* R. Doc. 7 at ¶ 2 ("Nucor has commenced construction of a different type of DRI manufacturing process, the 'HYL' process, which is not permitted at all under PSD.").

7604(a)(1).  It characterized its inability to file an immediate
suit under § 7604(a)(3) based on a violation of the PSD as an
infringement of its due process rights and irreparable injury.
Zen-Noh made this argument before LDEQ reopened the permit.
Regardless of whether it had merit then, this argument certainly
has no merit now.  As defendants point out, the reopening of the
permit addresses Zen-Noh's contentions that no BACT analysis for
HYL process was conducted, that air quality limitations are more
stringent for the HYL process, and that Zen-Noh was denied the
right to comment publicly on the substitution of the HYL process
for the Midrex process.  LDEQ has required CEMI to submit BACT
and air quality analysis specific to the HYL process and provided
for a public comment period.  Further, the draft PSD contained
the more stringent emissions limitations from the modified Part
70 permit that Zen-Noh sought.  It is clear, therefore, that if
the LDEQ issues a final PSD permit that looks like the draft,
plaintiff will have received what it said it wanted: more
stringent emissions limitations and the ability to file an
immediate citizen suit under § 7604(a)(3) if they are violated.[42]

---

[42] Plaintiff has raised questions about the agency's
procedural compliance with the Louisiana SIP in urging this court
to enjoin construction despite the reopener. But a suit under §
7604(a)(3) is limited to determining whether CEMI is constructing
the unit without or in violation of a PSD permit.  Such a
determination would be premature in light of the reopener.  The
proper route for challenging agency permitting procedures is the
state court system under La. Rev. Stat. Ann. § 30:2050.21.

Of course, it is not absolutely certain that LDEQ will issue a modified PSD permit reflecting the limitations in the draft before the unit is operational.  But defendants represented that they expected the modified PSD permit to be finalized by the end of 2012.[43]  Operation of the HYL plant is not scheduled to begin until at least the second quarter of 2013.[44]  Thus any injury to plaintiff "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998)(citation and internal quotation marks omitted).

Even if CEMI somehow is able to begin operation before a new PSD permit is issued, Zen-Noh can re-file an immediate suit in federal district court under § 7604(a)(3), because CEMI would allegedly be operating without a valid PSD permit. *See Weiler v. Chatham Forest Products, Inc.*, 392 F.3d 532, 538-39 (2d Cir. 2004)(plaintiff alleging that proposed building was a major source of emissions and lacked the required PSD permit could bring immediate § 7604(a)(3) suit despite state environmental

---

[43] LDEQ's other permitting decisions related to this project support defendant's estimate.  The initial PSD permit for the DRI facility was issued on January 27, 2011, approximately five months after CEMI first applied for it on August 20, 2010.  The modified Part 70 permit was issued on March 8, 2012, just over five months after CEMI applied for it on September 29, 2011.  The PSD permit was reopened on June 21, 2012, and the public comment period ends on October 8, 2012, indicating that issuance is likely by the end of the year.

[44] R. Doc. 25-5 at 2.

control agency's prior determination that a PSD permit was not required). Thus, Zen-Noh will not suffer a loss of its due process rights or any other concrete injury regardless of whether LDEQ issues the modified permit as expected or not. This suit is unripe because any hardship to the parties is "abstract and hypothetical." *Monk* 340 at 282.

The second *Coliseum Square* consideration also weighs against adjudication of this suit because judicial review of the merits of Zen-Noh's claim would interfere with agency action. *Coliseum Square* 465 F.3d at 245. LDEQ has stated a preliminary determination that the existing PSD permit allowed for construction of the HYL plant.[45] The explicit purpose of the reopener is for the agency itself to weigh additional information and determine whether modification of the permit is necessary, and if so, in what ways. In deciding the merits of this case, the Court would have to make the same determination. Whether current construction is authorized by the existing PSD permit is the central question of both proceedings. Further litigation in this Court would interfere with and duplicate the currently ongoing state administrative proceedings.

It is also clear that the Court would benefit from further factual development at the agency level. The PSD program sets up numerous substantive and procedural requirements for constructing

---

[45] R. Doc. 29-1 at 1; R. Doc. 33-5 at 2.

a major emitting facility.   State agencies such as the LDEQ have the expertise, experience, and procedural mechanisms to conduct the air quality analyses and evaluations of proposed technologies that are required in making PSD permit determinations.[46]   Through the permit reopener, the LDEQ has requested additional submissions from CEMI and public comment in order to determine the proper BACT and emissions limits for the HYL plant.   This Court, on the other hand, cannot look beyond the record established by the parties.   Deciding the merits of this case without access to the fully developed agency record would therefore be imprudent.

## IV.   CONCLUSION

Given all of the forgoing reasons, the Court concludes that this case is not ripe for judicial review. Therefore, the motion for summary judgment is DENIED and the complaint is dismissed without prejudice.

New Orleans, Louisiana, this 12th day of December, 2012.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[46] Congress has given state agencies the primary role in administering and enforcing the many components of the PSD program, with the EPA playing an oversight role.  *ADEC v. EPA, 540 U.S. 461, 491* (2004) (quoting 57 Fed.Reg. 28,095 (1992)).