UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ZEN-NOH GRAIN CORPORATION                    CIVIL ACTION

VERSUS                                        NO: 12-1011
                                              c/w 12-1738

CONSOLIDATED ENVIRONMENTAL                    SECTION: R(1)
MANAGEMENT, INC. - NUCOR
STEEL LOUISIANA
**THIS DOCUMENT RELATES TO MATTER 12-1738**


**ORDER AND REASONS**


Plaintiff Consolidated Environmental Management, Inc.
("Nucor") filed this lawsuit against Zen-Noh alleging violations
of the Clean Air Act ("CAA") and the federally enforceable
Louisiana State Implementation Plan stemming from Zen-Noh's
operation of a grain elevator in St. James Parish.[1] Zen-Noh has
filed a motion to dismiss all nine counts of Nucor's First
Amended Complaint.[2] Also before the Court is Nucor's motion for
partial summary judgment on the issue of whether Zen-Noh's Air
Permit has expired.[3] For the foregoing reasons, the Court
dismisses Counts I-III, Count V, and Counts VII-IX and denies the
motion to dismiss Counts IV and VI of the First Amended

---

[1] Civil Action 12-1738, R. Doc. 1 (Complaint); Civil Action
12-1011, R. Doc. 46 (First Amended Complaint).

[2] R. Doc. 42.

[3] R. Doc. 79.

Complaint. The Court also denies Nucor's motion for partial summary judgment.


I.    **STATUTORY BACKGROUND**

Congress enacted the CAA "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401(b)(1). The Act is a comprehensive program for controlling and improving the nation's air quality. Under the Act, the Administrator of the Environmental Protection Agency identifies air pollutants that endanger the public health or welfare, determines what concentrations of those pollutants are safe, and codifies those safety determinations as National Ambient Air Quality Standards ("NAAQS"). *See* 42 U.S.C. §§ 7408, 7409. The Act then delegates to the states "primary responsibility for assuring air quality" within their respective boundaries, and requires each state to develop a State Implementation Plan ("SIP"), "which will specify the manner in which [the NAAQS] will be achieved and maintained." 42 U.S.C. § 7410(a). Upon approval by the EPA, an SIP becomes federally enforceable law. *Louisiana Envtl. Action Network v. EPA*, 382 F.3d 575, 579 (5th Cir. 2004); *Kentucky Res. Council, Inc. v. EPA*, 304 F. Supp. 2d 920, 923 (W.D. Ky. 2004); *Sweat v. Hull*, 200 F. Supp. 2d 1162, 1164 (D. Ariz. 2001).

Although the states "have 'wide discretion' in formulating their plans," *Alaska Department of Environmental Conservation v. EPA*, 540 U.S. 461, 470 (2004) (quoting *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976)), the CAA mandates that all State Implementation Plans include certain features. Of relevance here, the Act provides that each State Implementation Plan shall "meet the applicable requirements" of what is known as the Prevention of Significant Deterioration of Air Quality ("PSD") program. 42 U.S.C. § 7410(a)(2)(J); *see also* 42 U.S.C. § 7471. The PSD program, which applies to areas where the ambient level of air pollution already meets the NAAQS, *see* 42 U.S.C. § 7471, was "designed to ensure that the air quality in attainment areas or areas that are already 'clean' will not degrade." *Alaska Department of Environmental Conservation*, 540 U.S. at 470 (quoting BELDEN, CLEAN AIR ACT 43 (2001)). The CAA divides emission sources into major and minor pollution sources. 42 U.S.C. § 7479(1). The PSD requirements are triggered when a stationary source is a major source. La. Admin. Code tit. 33, pt. III, § 509. The CAA requires facilities constructing or modifying major sources to obtain a preconstruction permit from agencies administering EPA-approved state implementation programs. 42 U.S.C. §§ 7475(a)(1), 7479(2)(C). The PSD review process requires a demonstration that "emissions from construction or operation of such facility will not cause, or contribute to, air pollution"

3

above the maximum allowable increment for the local air quality area, the national ambient air quality standards (NAAQS), or any other applicable emission standard. *Id.* § 7475(a)(3).

The PSD program relates to preconstruction permits for major sources, while Title V of the CAA deals with operating permits. 42 U.S.C. §§ 7661–7661f. As with the PSD program, Louisiana has a corresponding Title V operating permit program (also known as the Part 70 Permit program). La. Admin. Code tit. 33, pt. III, § 507. It is unlawful to operate a major source without a Part 70 operating permit or to operate except in compliance with an operating permit issued under Part 70. *Id.* In general, a stationary source requires a Part 70 operating permit if it directly emits or has the potential to emit 100 tpy or more of any regulated pollutant. *Id.* at § 502. The PSD and Part 70 permit programs are incorporated into Louisiana rules under Louisiana Administrative Code title 33, part II, chapter 5 ("Louisiana SIP"), which has been approved as satisfying the requirements of the CAA, 42 U.S.C. § 7411, *et seq.*

The Louisiana SIP also includes regulations for issuing permits for minor stationary sources, as well as regulations establishing emissions standards and work practice standards. Minor sources are facilities that emit less than a pre-identified amount, usually 100 tons per year, of a regulated contaminant after construction or modification. Understandably, Congress and

the EPA have devoted less attention to the regulation of minor sources compared to major sources for which PSD and Part 70 apply. *See Texas v. U.S. E.P.A.*, 690 F.3d 670, 675 (5th Cir. 2012).

The CAA contains three citizen suit provisions. One of the provisions authorizes suits against the EPA Administrator for alleged failure of the Administrator to perform a non-discretionary duty under the CAA. 42 U.S.C. § 7604(a)(2). The other two provisions allow suit in federal district court against any person who is alleged to have violated an emission standard of the CAA. Section 7604(a)(3) authorizes immediate suit against any person who is alleged to be constructing or operating a major source of emissions without or in violation of a PSD permit. Section 7604(a)(1) permits suit based on a range of CAA violations, including violation of PSD permits, Part 70 permits, and the NAAQS. Although a 7604(a)(3) action can be brought immediately, suit under the broader 7604(a)(1) requires that the plaintiff give 60 days notice to the EPA Administrator, to the State in which the violation occurs, and to any alleged violator of the standard, limitation, or order. *Id.* § 7604(b)(1)(A).

## II.  FACTUAL BACKGROUND

The parties in this case are feuding neighbors with property next to each other on the Mississippi River in St. James Parish.

Nucor is constructing a steel production facility that Zen-Noh has vigorously opposed. Zen-Noh was the first to bring the conflict between the parties into federal court. In 2009, Zen-Noh sought to enjoin the Louisiana Department of Environmental Quality ("LDEQ") from issuing air permits for a pig iron plant to Nucor. Then, in 2012, Zen-Noh sought to enjoin Nucor from constructing the first of two direct reduced iron ("DRI") plants under authority of other air permits issued by LDEQ to Nucor. Zen-Noh has also contested LDEQ actions granting Nucor permits for its steel plants and sued the EPA for objecting to, but failing to revoke, Nucor's air permits.

To seize the offensive, Nucor filed the complaint in this action alleging that Zen-Noh has itself run afoul of federal and state air quality laws in the operation of its grain elevator. Nucor issued to Zen-Noh, LDEQ, and the EPA, notice letters relating to Zen-Noh's alleged violations of the CAA and Louisiana SIP on April 30, 2012. Nucor filed its original complaint against Zen-Noh on July 3, 2012. That suit, Civil Action No. 12-1738, was consolidated with Zen-Noh's suit against Nucor under Civil Action No. 12-1011. Zen-Noh moved to dismiss the Nucor complaint.[4] Nucor then filed its First Amended Complaint.[5] The Court determined that Zen-Noh's motion to dismiss applies to Nucor's First Amended

---

[4] R. Doc. 42.

[5] R. Doc. 46.

Complaint as well as its original complaint.[6] On the same day that it filed its First Amended Complaint, Nucor also provided amended notice letters to Zen-Noh, LDEQ, and the EPA.[7]

A. *Nucor's Allegations*

Nucor's complaints allege that Zen-Noh has submitted false information to LDEQ and improperly obtained permits for its grain elevator facility as a minor source when it is in fact a major source subject to Part 70 and PSD permitting programs.[8] It alleges that Zen-Noh has failed to comply even with its LDEQ-issued minor source permit. Nucor seeks to enjoin Zen-Noh from operating its facility, allegedly a major source, without first obtaining Part 70 and PSD permits and to require Zen-Noh to comply with applicable conditions of the Louisiana SIP, the Part 70 rules, and the terms of the minor source permit ("Air Permit") issued by LDEQ. Nucor also urges the Court to assess civil penalties against Zen-Noh pursuant to 42 U.S.C. § 7604, and La. Rev. Stat. §§ 30:2025 and 30:2026(A)(2).

1. Allegations that Zen-Noh is Subject to PSD and Part 70 Requirements

───────────────────

[6] R. Doc. 101.

[7] R. Doc. 46-3.

[8] R. Doc. 46.

Nucor alleges that in 1979 Zen-Noh applied for approval of air emissions for its grain elevator and ship loading operation ("Grain Elevator") from the predecessor to LDEQ.[9] Nucor alleges that Zen-Noh's initial application stated that the Grain Elevator would handle, on average, 190 billion bushels of grain and grain by-products per year and 3.1 million pounds of grain dust per year, and would emit 1.871 pounds per hour (1.949 tpy) of grain dust and 2.4 pounds per hour (1.73 tpy) of grain dryer emissions.[10] The application also identified the pollution control equipment Zen-Noh would use. The Louisiana Air Control Commission issued a minor source permit (Permit 1258) to construct and operate the Grain Elevator on September 25, 1979.[11] Nucor alleges that Zen-Noh began to operate the Grain Elevator in 1982.[12]

Nucor alleges that the predecessor to LDEQ inspected the Grain Elevator on September 21, 1983, and observed that Zen-Noh was operating a fourth shiploader.[13] According to Nucor, Zen-Noh was not permitted to operate the fourth shiploader, which had a potential to emit particulate matter in excess of 250 tpy in

---

[9] R. Doc. 46 at 10.

[10] *Id.* at 10-11.

[11] *Id.* at 11.

[12] *Id.*

[13] *Id.* at 12.

8

1979.[14] It alleges that this shiploader rendered the Grain Elevator a "major source" for which PSD permitting was required before Zen-Noh could legally construct or operate it.[15] Nucor alleges that Zen-Noh has filed a series of applications to modify its 1979 state air permit with LDEQ. It alleges that Zen-Noh submitted a permit reconciliation application to LDEQ in 1995 and that LDEQ issued air permit No. 2560-00005-01, which authorized the facility to emit 106.85 tpy of particulate matter less than 10 microns in diameter (PM-10).[16] Nucor asserts that after Part 70 was added to the CAA in 1990, Zen-Noh was required to submit a Part 70 permit application by October 12, 1996, and it failed to do so.[17] It alleges that Zen-Noh lost its authorization to operate in Louisiana at that time. Nucor alleges that Zen-Noh sought and received permit modifications in 1998 and 1999.[18] It alleges that in June 2012, after Nucor sued Zen-Noh, Zen-Noh submitted another permit modification application to LDEQ.[19]

---

[14] *Id.*

[15] *Id.*

[16] *Id.* at 13.

[17] *Id.*

[18] *Id.* at 14.

[19] *Id.* (Nucor includes in its complaint a table listing the emissions calculations Zen-Noh submitted to LDEQ in its June 2012 modification application).

Nucor alleges that Zen-Noh represented in the June 2012 modification application that it would use dust collectors "to lower its particulate emissions below 100 tpy and 250 tpy and thus avoid major source Title V and PSD permitting requirements." It contends that these representations are false and inconsistent with Zen-Noh's actual emissions, "as shown by opacity observations and by other information provided by Zen-Noh to LDEQ in its permit applications."[20] On information and belief, Nucor alleges that "Zen-Noh has consistently emitted greater quantities of particulate air pollution (PM and PM-10) than is allowed by its permits, in violation of its permits as issued, and in violation of requirements to have PSD and Title V permits."[21] It alleges that Zen-Noh's permit applications utilize incorrect emissions factors for "PM and/or PM-10", overstate the dust capture efficiencies of its grain handling equipment, overstate the control efficiencies of its dust filters, and fail to include fugitive emissions from dust not captured by its grain equipment and other sources such as truck traffic and the excess grain stockpile.[22]

Nucor includes in its First Amended Complaint a table listing what it alleges to be "Plaintiffs' Calculations of Zen-

---

[20] *Id.* at 15.

[21] *Id.*

[22] *Id.* at 16-17.

Noh's actual emissions," based on "information provided by Zen-Noh in its 1995 and 2012 permit applications, corrected to utilize appropriate emission factors, capture efficiencies, and control efficiencies and to account for fugitive emissions from truck traffic, scalping piles and other sources."[23] The table lists Zen-Noh's actual emissions as follows: PM-10 - 292.7 tpy; particulate matter less than 2.5 microns (PM-2.5) - 52.6 tpy; total suspended particulate matter (TSP) - 454.9 tpy.[24] Nucor alleges that the Grain Elevator thus meets the definition of major stationary source under La. Admin. Code tit. 33, pt. III, § 502 because "it has actual PM/TSP emissions over 250 tons per year (greater than the major source threshold of 100 tons per year)."[25] Nucor alleges that Zen-Noh needs a Part 70 permit and a PSD to continue its operations.[26] It alleges that LDEQ has never issued a PSD permit or a Part 70 permit to Zen-Noh or made a determination that Zen-Noh is a major emitting source of pollutants.[27]


2. Allegations That Zen-Noh's Air Permit is Expired

---

[23] *Id.* at 17.

[24] *Id.*

[25] *Id.* at 18.

[26] *Id.* at 19-20.

[27] R. Doc. 79 at 1 n.1.

Nucor alleges that Zen-Noh is operating under an expired state air permit No. 2560-000005-05 ("Air Permit").[28] It alleges that La. Rev. Stat. § 30:2023(A) imposes a statutory ten-year limit on Zen-Noh's permit, and that Zen-Noh has failed to submit an application for renewal of its permit within the applicable period.[29] Nucor alleges that Zen-Noh's permit expired on July 31, 1999.[30] It asserts that "Zen-Noh should be required to submit a complete renewal application and should be prohibited from operating until a revised permit is issued."[31]

3. Allegations That Zen-Noh Has Violated the Terms of Its Air Permit

Specific Condition No. 2 of Zen-Noh's Air Permit requires it to use tarpaulins when loading ships, except during topping off operations.[32] Nucor alleges (upon information and belief) that Zen-Noh has violated this condition on at least six specific dates since October 28, 2010.[33]

---

[28] R. Doc. 46 at 20.

[29] *Id.*

[30] *Id.*

[31] *Id.* at 21.

[32] R. Doc. 42-3 at 5.

[33] R. Doc. 46 at 22.

Specific Condition No. 3 of the Air Permit requires Zen-Noh to conduct loading and unloading operations such that they do not cause a nuisance to the public.[34] Nucor alleges that Zen-Noh violated this condition by failing to control emissions from its loading and unloading operations resulting in significant dusting, which it alleges has caused a nuisance, "if not more serious health threats from grain dust, to Consolidated-Nucor employees and contract workers in the area of the future Consolidated-Nucor dock facility."[35]

Specific Condition No. 4 of the Air Permit requires Zen-Noh to comply with 40 C.F.R. Part 60, Subpart DD standards for performance for grain elevators, including 20% opacity standards for emissions.[36] Nucor alleges that a third party consultant conducted opacity readings and found "significant violations of the 20% opacity standards."[37]

4. Other Allegations

Nucor alleges that Zen-Noh has not adequately categorized Volatile Organic Compound ("VOC") and particulate matter (PM and PM-10) emissions from its wood chip handling, storage,

---

[34] R. Doc. 42-3 at 5.

[35] R. Doc. 46 at 22.

[36] R. Doc. 42-3 at 5.

[37] R. Doc. 46 at 24.

13

reclamation, and transformation operations.[38] It alleges that Zen-Noh indicated in its permit modification application that emissions from the wood chips were minimal but that "most pulp and paper mills in the State of Louisiana and most wood yards storing similar materials include relatively significant VOC emissions estimates in their permits."[39]

Nucor also alleges that Zen-Noh's June 28, 2012, application for a minor permit modification includes information that amounts to admissions by Zen-Noh that many aspects of its operation have long occurred without proper authorization in its Air Permit.[40] It also alleges that Zen-Noh has failed to provide all relevant facts, even in its most recent permit application, and that the "submittal of incorrect information in the permit application is a violation of La. Admin. Code tit. 33, pt. III, § 517.C, a provision of the approved part 70 permitting program and a violation of the current minor source permit, General Condition I, issued under the Louisiana SIP."[41]

5. Claims

---

[38] *Id.* at 24-25.

[39] *Id.* at 25.

[40] *Id.* at 25-28.

[41] *Id.* at 29.

Nucor alleges nine counts in its First Amended Complaint. Count I alleges that Zen-Noh violated the CAA and the Louisiana SIP by operating without a Part 70 operating permit. Counts II-IV allege that Zen-Noh violated Special Conditions 2-4 of its Air Permit by failing to use tarpaulins when loading and unloading, creating a dust nuisance by its unloading and loading operations, and violating 20% opacity standards of 40 C.F.R. Part 60, Subpart DD. Count V alleges that Zen-Noh failed to provide correct information in its application for its Air Permit or in its modification applications. Count VI alleges that Zen-Noh has exceeded PM-10 limitations in violation of General Condition 1 of the Air Permit. Count VII alleges that Zen-Noh is operating without a required PSD permit. Count VIII alleges that Zen-Noh is operating under an expired air permit. Count IX alleges that Zen-Noh is operating the wood chip storage unit without appropriately identifying the VOC pollutants associated with such an operation in its permit application.

## III. Legal Standard

### A. Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1960 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547

(2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1940. A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). But the Court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 129 S.Ct. at 1949.

A legally sufficient complaint must establish more than a "sheer possibility" that the plaintiff's claim is true. *Id.* It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Twombly,* 550 U.S. at 555. In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand*, 565 F.3d at 256. If there are insufficient factual allegations to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Carbe v. Lappin*, 492 F.3d 325, 328 n.9 (5th Cir. 2007), the claim must be dismissed.

**B. Summary Judgment**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or

"showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith ex rel. Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988). Although a nonmovant's failure to respond to a motion for summary judgment does not permit the entry of a "default" summary judgment, the court may accept the movant's evidence as undisputed. *Eversley v. Mbank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988).


## IV.  DISCUSSION

## A. Count I

Count I alleges that Zen-Noh is required to have a Part 70 operating permit pursuant to La. Admin. Code tit. 33, pt. III, § 507, and that it has been operating without one in violation of the Louisiana SIP and the CAA. Zen-Noh concedes that it lacks a Part 70 permit and argues that: 1) Nucor has failed to allege facts indicating that Zen-Noh's grain elevator is subject to Part 70 permitting, and 2) in any event, Nucor's notice of intent to sue was insufficient to inform Zen-Noh of the nature of the alleged violation, and thus the Court lacks subject matter jurisdiction to hear Nucor's citizen suit.

In general, a plaintiff must provide specific notice of intent to sue at least 60 days before filing a citizen suit. *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989). Under the Clean Air Act's citizen suit provision, at least 60 days before filing suit, the citizen plaintiff must give "notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order" allegedly violated. 42 U.S.C. § 7604(b)(1)(A). The notice must contain:

> sufficient information to permit the recipient to identify the specific standard, limitation, or order which has allegedly been violated, the activity alleged to be in violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name and address of the person giving the notice.

40 C.F.R. § 54.3(b) (2004). Although "the notice requirement does not demand that a citizen plaintiff "list every specific aspect or detail of every alleged violation," it must provide enough information to permit the defendant to identify the standards allegedly violated and the relevant activities with the degree of specificity required by the regulations. *Nat'l Parks & Conservation Ass'n v. Tennessee Valley Auth.*, 502 F.3d 1316, 1329 (11th Cir. 2007). "The notice requirements are strictly construed to give the alleged violator the opportunity to correct the problem before a lawsuit is filed." *Id.* (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, Inc., 484 U.S. 49, 60, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987)).

Nucor issued a notice of intent to sue on April 30, 2012.[42] The notice letter alleged violations corresponding to Counts I-VI in the First Amended Complaint. The relevant part of the letter for Count I of the First Amended Complaint alleged that:

> Zen-Noh should have a Title V [Part 70] operating permit pursuant to LAC 33:III.507, but does not. In its certified application for a minor source permit modification in December 2001, Zen-Noh certified that its total particulate emissions were greater than 153 tons per year. Total particulate is a regulated air pollutant per LAC 33.III.502, definition of regulated air pollutant. ... Zen-Noh meets the definition of major source under LAC.33.III.502 - it has PTE [potential to emit] for total particulate emissions of 153 tons per year (greater than 100 tons per year), including fugitive emissions. ... Each day that Zen-Noh has operated and continues to operate since October 12,

---

[42] R. Doc. 46-1.

1996 without a Title V operating permit is a violation
of LAC:III:507, La. R.S. 30:2055 and 2057, 40 C.F.R.
70.7, and 42 U.S.C. § 7661a(a).[43]

Nucor argues that its letter provided sufficient notice.
Nucor points to the letter's allegation that Zen-Noh has the
potential to emit greater than 100 tons per year of total
particulate. Part 70 permitting requirements apply only to major
stationary sources, which are defined as those sources that
directly emit or have the potential to emit 100 tpy or more of
any regulated pollutant. Nucor argues that "total particulate" is
the same as total suspended particulate matter ("TSP") and that
both are regulated pollutants under Part 70. Zen-Noh argues that
Nucor's April 2012 letter was defective because total particulate
and TSP are not regulated air pollutants under Part 70, and thus
cannot trigger the Part 70 permitting requirements.[44]

The Louisiana SIP under Part 70 defines "regulated air
pollutants" by identifying several specific pollutants, *e.g.*,
nitrogen oxides and volatile organic compounds (VOCs), and
referring to categories of pollutants established by other

---

[43] *Id.*

[44] Zen-Noh also contends that total particulate and TSP are
not the same thing. *See* R. Doc. 42-1 at 3 (citing 40 C.F.R. §
51.100 which includes unique definitions for "particulate matter"
and "total suspended particulate."). Because neither particulate
matter nor TSP are regulated air pollutants under Part 70, *see
infra*, the Court need not discuss any differences between the two
terms.

statutes, *e.g.*, pollutants for which there is a national ambient air quality standard ("NAAQS"), pollutants which are subject to a new source performance standard ("NPS"), pollutants subject to review under the PSD scheme, and "pollutants listed as Louisiana toxic air pollutants in LAC 33.III.5112, Table 51.1 or 52.3." La. Admin. Code tit. 33, pt. III, § 502. "Particulate matter" and TSP are not included as specifically listed pollutants or defined as a regulated air pollutants under any of the incorporated regulatory schemes. The EPA explained in a 1995 Guidance Opinion that particulate matter and TSP are not regulated air pollutants under the Part 70 operating permits program. *See* "Definition of Regulated Pollutant for Particulate Matter for Purposes of Title V," EPA-HQ-OAR-2007-0743-0001 (Oct 16, 1995), available at www.regulations.gov/#!docketDetail;D=EPA-HQ-OAR-2007-0743. The opinion clarified that "under the title V operating permits program only PM-10 [particulate matter with a diameter of 10 micrometers or less] is considered by the EPA to be the regulated form of particulate matter for applicability and fee purposes." *Id.* at 1. The EPA's conclusion is based on the evolution of NAAQS and NPS standards. *Id.* at 2-3. The original NAAQS for particulate matter was promulgated in 1971 and defined ambient concentrations of particulate matter as TSP, which included particulate matter with a diameter of up to 45 micrometers. *Id.* at 2. In 1987 "the EPA revised the NAAQS for particulate matter, replacing the TSP

22

indicator with the new PM-10 indicator." *Id.* The NPS standard with respect to particulate matter is likewise PM-10, not TSP or particulate matter. *Id.* at 3. Nucor fails to provide any reasonable statutory basis to stray from the EPA's interpretation of the Clean Air Act that PM-10 is the sole type of particulate matter that qualifies as a regulated pollutant under Part 70. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer").

Nucor alleges in its notice letter that Zen-Noh has potential to emit 153 tons per year of total particulate. The basis for this allegation is Zen-Noh's 2001 application to modify its minor source air permit with LDEQ.[45] In addition to listing the 153 tons per year figure for total particulate, that permit application states that Zen-Noh has a potential to emit 63.2 tons per year of PM-10.[46] Nucor did not include the PM-10 figure in its notice letter, presumably because it is below the 100 tpy threshold which would render the source a major source subject to Part 70 permitting. In sum, Nucor's original letter gave notice only that Zen-Noh had the potential to emit more than 100 tpy of particulate matter, which is not regulated under Part 70. As to

---

[45] R. Doc. 42-2 at 17.

[46] *Id.* at 19.

23

Count I of the complaint, the letter gave notice of patently lawful conduct with no indication of any unlawful conduct that could be corrected before Nucor filed its citizen suit.

Nucor did not remedy its failure to give the required notice of its Count I claim by filing an amended notice of intent to file a citizen suit[47] on October 16, 2012, the same day it filed its First Amended Complaint. The citizen suit provision of 42 U.S.C. § 7604(b) prohibits suits under § 7604(a)(1) unless the defendant has given 60 days notice of the specific violation at issue. The purpose of the notice provision - to allow facilities to correct deficiencies before citizen suits are filed - would obviously be stymied if a plaintiff could wait until after it had filed suit to provide notice of the specific violation alleged. *Nat'l Parks & Conserv. Ass'n*, 502 F.3d at 1329-30. Only the April 16, 2012, notice letter was provided 60 days before Nucor filed its original complaint and its First Amended Complaint and that letter did not give specific notice of the violation alleged in Count 1. For those reasons, the Court must dismiss Count 1 of the First Amended Complaint as in violation of the notice requirement of 42 U.S.C. § 7604(b).

**B. Counts II and III**

---

[47] R. Doc. 46-3.

Count II alleges that "Zen-Noh had failed to control particulate emissions (PM and PM-10) from its loading operations through the use of tarpaulins or closed covers in accordance with the terms and conditions of its minor source air permit ['Air Permit']".[48] Count III alleges that Zen-Noh violated its Air Permit by failing to control particulate emissions (PM and PM-10) from its loading and unloading operations resulting in a dusting nuisance to the public.[49] In both of these counts, Nucor alleges that Zen-Noh's violation of Specific Conditions of its Air Permit amount to violations of the Louisiana SIP and the CAA.

Zen-Noh moves to dismiss these counts on the grounds that they fail to allege enforceable violations under 42 U.S.C. § 7604. The citizen suit provision of § 7604(a)(1) limits private enforcement to "emission limitations and standards under this chapter [*i.e.*, the Clean Air Act]." *See* § 7604(a)(1). As applicable here, this includes "any ... standard, limitation, or schedule established ... under any applicable State implementation plan approved by the Administrator, [and] any permit term or condition, ... which is in effect ... under an applicable implementation plan." 42 U.S.C. § 7604(f)(4); *see CleanCOALition v. TXU Power*, 536 F.3d 469, 476-77 (5th Cir. 2008) (holding that § 7604(f)(4) encompasses SIP provisions and permit

---

[48] R. Doc. 46 at 34.

[49] *Id.* at 35.

limits established under SIP provisions). Nucor insists that the Specific Conditions of the Air Permit Zen-Noh is alleged to have violated in Counts II and III are permit terms in effect under the federally approved Louisiana SIP provisions, La. Admin. Code tit. 33, pt. III, §§ 905(A), 1305, and 1311.

LDEQ's permit rules differentiate between permit terms that LDEQ must include in permits under applicable state and federal air quality law, and "such other terms and conditions as deemed by the permitting authority to be reasonable and necessary." *See* La. Admin. Code tit. 33, pt. III, § 501.C.6. Of the types of permit terms that LDEQ may include in an operating permit, only the "federally applicable requirements," which include standards in the approved SIP and PSD permit conditions, fall within Section 7604(f)'s definition of an "emission standard or limitation under this chapter." Thus, there is a category of "other terms and conditions" that LDEQ may include in permits that are not "emission standards or limitations under" Section 7604, and are thus not federally enforceable.

The question remains whether Specific Conditions 2 and 3 of the Air Permit, which form the basis for Counts II and III, respectively, are specific standards approved under the Louisiana SIP or terms that are not federally enforceable. Specific Condition 2 requires the permit holder to use tarpaulins or closing covers during all ship loading operations except during

26

topping off procedures.[50] Specific Condition 3 requires the permit holder to "conduct loading/unloading operations in such a manner, regardless of the inconvenience to the permittee and even when all other special conditions are complied with, such that fugitive emissions created by such operations are not a nuisance to the public." There is no SIP provision or regulation that specifically reflects the requirements imposed by Specific Conditions 2 and 3. Instead, Nucor argues that a variety of general federal and state statutes authorize the conditions.[51] Of the laws Nucor alleges Zen-Noh violated in Counts II and III, only La. Admin. Code tit. 33, pt. III, §§ 905, 1305, and 1311 are in the Louisiana SIP. Section 905 requires sources to install air pollution control equipment "whenever practically, economically, and technologically feasible." Section 1305 requires "all reasonable precautions [to] be taken to prevent particulate matter from becoming airborne." Section 1305 includes a non-exclusive list of precautions for limiting airborne dust but none of the listed precautions is applicable to ship loading/unloading.

---

[50] R. Doc. 42-3 at 3.

[51] R. Doc. 46 at 34-35 (Nucor alleges in Counts II and III that Zen-Noh has violated La. Admin. Code tit. 33, pt. III, §§ 905, 1305, and 1311; La. Rev. Stat. Ann. §§ 30:2055 and 2057; the Clean Air Act, 42 U.S.C. § 7470, *et seq.*).

27

The first two SIP provisions relied on by Nucor, Sections
905 and 1305 of La. Admin. Code tit. 33, pt. III, provide only
general guidance to use control equipment when feasible and to
take reasonable precautions against particulate matter becoming
airborne. In order to be enforceable under § 7604, the provisions
of the Louisiana SIP must be specific enough to be considered
"standards" or "limitations". 42 U.S.C. § 7604(f)(4); *McEvoy v.
IEI Barge Servs., Inc.*, 622 F.3d 671, 678 (7th Cir. 2010). In
*McEvoy*, the Seventh Circuit held that two regulations in the
Illinois SIP lacked the specificity required to be judicially
enforceable under § 7604. The first provision stated that "[n]o
person shall cause ... or allow the discharge or emission of any
contaminant into the environment in any state so as ... to cause
or tend to cause air pollution in Illinois." *Id.* The panel found
that such a "broad, hortatory statement," could not "be viewed as
a 'standard' or 'limitation' at all," and thus Congress did not
provide a cause of action for its enforcement in § 7604(a)(1)(A).
*Id.* The second regulation in *McEvoy* was less broad and presented
a "closer call" for the court. *Id.* The second regulation stated
that "no person shall cause or allow the emission of fugitive
particulate matter from any process ... that is visible by an
observer looking generally toward the zenith at a point beyond
the property line of the source." Ill. Admin. Code tit. 35, §
212.301. The panel noted the difficulty a federal court would

have in enforcing the provision due to the lack of specificity
and guidance provided by the regulation. *McEvoy,* 622 F.3d at 679-
80. It observed that a federal court had no guidance regarding
the characteristics of the observer, whether weather conditions
mattered, and how many days per year or hours per day the
emission must be visible to trigger the provision. The panel
concluded that Congress did not intend for federal courts to
flesh out the specifics of the provision and that it could not be
used as the basis of a citizen's suit under the Clean Air Act.
*Id.*

The SIP provisions of Sections 905, and 1305 of La. Admin.
Code tit. 33, pt. III, are likewise too broad to constitute
enforceable "standards" or "limitations." These provisions
require control equipment "whenever ... feasible" and "all
reasonable precautions," without any specific guidance as to the
boundaries of feasibility and reasonableness. Thus, these
provisions of the Louisiana SIP are not federally enforceable and
cannot form the basis for Counts II and III in Nucor's citizen
suit.

The other SIP provision Nucor relies on is Section 1311 of
La. Admin. Code tit. 33, pt. III. Unlike the other two
provisions, Section 1311 imposes specific mass emission limits
that depend on the maximum production rate of the emitting
facility. Nevertheless, this provision does not mention or relate

to the conduct regulated by Specific Conditions 2 and 3: loading and unloading operations. *See* La. Admin. Code tit. 33, pt. III, § 1311. Therefore, the conduct alleged in Counts II and III - namely violations of Specific Conditions 2 and 3 of the Air Permit - cannot be made federally enforceable by Section 1311, a provision of the SIP that has nothing to do with that conduct.

In sum, the Court finds that Counts II and III fail to allege violations of any federally enforceable limit or regulation. Those counts must therefore be dismissed.

## C. Count IV

Count IV alleges that Zen-Noh violated the 20% opacity standards contained in the Air Permit as Specific Condition 4 and contained in 40 C.F.R. § 60.302(c), and La. Admin. Code tit. 33, pt. III, § 1311.C.[52] In this case, the conduct alleged is specifically prohibited by the Louisiana SIP, La. Admin Code tit. 33, pt. III, § 1311(C), as required by EPA Regulations, 40 C.F.R. § 60.302(c). Because the Court finds that Nucor has alleged a claim under a federally enforceable provision of the Louisiana SIP, it denies the motion to dismiss Count IV, except it dismisses the claim to the extent it is also based on violation of La. Admin. Code tit. 33, pt. III, § 1305, which is not a

---

[52] *Id.* at 35-36.

30

specific limitation or regulation enforceable in a citizen suit. *See* discussion, *supra.*

**D. Count's V, VI, and VII**

Zen-Noh argues that Counts V-VII are barred by the statute of limitations. Claims brought under the Clean Air Act are subject to the general five-year statute of limitations for federal claims provided by 28 U.S.C. § 2426. *See CleanCOALition*, 536 F.3d at 478. The limitations statute bars any suit that is not brought within five years of the date the claim first accrues. *Id.* A claim first accrues on the date that a violation first occurs. *Nat'l Parks & Conservation Ass'n, Inc.*, 502 F.3d at 1322. The statute of limitations serves the important purposes of "barring stale claims and protecting expectations that have settled over time." *Id.* at 1326. Zen-Noh argues that the violations alleged in Counts V-VII occurred more than five years ago.

Count V alleges that "Zen-Noh failed to provide correct information in its application for the Air Permit or failed to promptly supplement or correct such information after the permit was issued," in violation of General Condition 1 of the Air Permit, La. Admin. Code tit. 33, pt. III, § 517(C), La. Rev. Stat. Ann. §§ 30:2055 and 2057, and Sections 110 and 113 of the

31

Clean Air Act.[53] Count VI alleges that Zen-Noh's actual emissions have exceeded the permitted emissions in violation of General Condition 1 of the Air Permit, La. Admin. Code tit. 33, pt. III, § 501, La. Rev. Stat. Ann. §§ 30:2055 and 2057, and Sections 110 and 113 of the Clean Air Act.[54] Count VII alleges that Zen-Noh should have obtained a PSD Permit when the elevator was constructed or when it constructed a fourth shiploader.[55] Counts V-VII are based on allegations that Zen-Noh did not specifically identify its fourth shiploader until 1995, that expansion of the wood chip storage pile in 2000 increased VOC emissions above 100 tpy, that Zen-Noh's control equipment did not work as effectively as indicated in the December 2001 permit application, and that Zen-Noh did not modify its permit after the EPA revised certain AP-42 emission factors for grain elevators in 2003. Nucor alleges that Zen-Noh's most recent permit modification occurred on March 20, 2002.[56] Because Counts V-VII are based on conduct that occurred more than five years before suit was filed in 2012, the statute of limitations bars these claims unless there is some basis for tolling.

---

[53] R. Doc. 46 at 36.

[54] *Id.*

[55] *Id.*

[56] *Id.* at 22.

Nucor makes several arguments why the statute of limitations does not bar these claims. First, Nucor argues that the statute of limitations does not apply to its claims because it seeks equitable as well as legal relief. Indeed, by its terms, the statute of limitations in 28 U.S.C. § 2462 applies only to suits "for the enforcement of any civil fine, penalty, or forfeiture," not to suits seeking injunctive relief. *See United States v. Westvaco Corp.*, 144 F. Supp. 2d 439, 443 (D. Md. 2001) ("five-year statute of limitations applies to claims for civil penalties only"). However, when a party seeks both equitable and legal relief, and the legal relief is time-barred, the statute of limitations applies to the equitable claims as well as the legal ones under the concurrent remedy doctrine. *See United Transp. Union v. Fla. E. Coast Ry. Co.*, 586 F.2d 520, 523-24 (5th Cir. 1978) (when party seeks both legal and equitable relief, statute of limitations bars both); *Nat'l Parks & Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 502 F.3d 1316, 1322 (11th Cir. 2007) (concurrent remedy doctrine bars citizen suit seeking declaratory and injunctive relief that was filed with time-barred claim for civil penalties under Clean Air Act). Thus, if the claims for civil penalties are barred as untimely, Counts V-VII must be dismissed in their entirety.

Nucor also argues that Counts V-VII are not barred by the statute of limitations because the violations alleged were

ongoing violations that continued within the statutory period. The Court will address the applicability of the continuing violation doctrine for each count separately.

1. Count VII

Count VII alleges that Zen-Noh failed to obtain a preconstruction PSD permit, as it was allegedly required to do before it constructed the Grain Elevator and the fourth shiploader. Nucor's argument that the statute of limitations on this claim was tolled under the continuing violation doctrine is unavailing. Under the continuing violation doctrine, the statute of limitations is tolled if the violation giving rise to the claim continues to occur within the limitations period. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982). Many courts have held that violations of the requirements of the preconstruction permitting process do not constitute continuing violations. *See, e.g., Nat'l Parks & Conservation Ass'n, Inc.*, 502 F.3d at 1322; *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 661 (W.D.N.Y. 2003); *United States v. Ill. Power Co.*, 245 F. Supp. 2d 951, 957-58 (S.D.Ill. 2003); *United States v. Westvaco Corp.*, 144 F.Supp.2d 439, 443-44 (D.Md.2001) (collecting additional cases). *National Parks & Conservation* is instructive. In that case, plaintiffs alleged that the Tennessee Valley Authority ("TVA") did not obtain new source construction

permits under the Alabama SIP for a boiler that it had operated since 1965 and modified in 1983. *Nat'l Parks & Conservation,* 502 F.3d at 1318. The TVA moved to dismiss based on the statute of limitations, because the suit was filed more than five years after the modification. *Id.* at 1321. The Eleventh Circuit affirmed the district court's order granting the motion to dismiss. *Id.* at 1330. It held that "a violation of the Clean Air Act's preconstruction permit requirements occurs at the time of the construction or modification and is not continuing in nature." *Id.* at 1323.

Count VII alleges a violation of Clean Air Act preconstruction requirements - the lack of a preconstruction PSD permit - and thus does not allege a continuing violation. As was the case in *Nat'l Parks & Conservation*, "this conclusion is reinforced by the very citizen suit provision [Nucor] invoke[s], which permits suit 'against any person who *proposes to construct or constructs* any new or modified major emitting facility without a permit.'" *Id.* (citing 42 U.S.C. § 7604(a)(3)). The Louisiana SIP, like the Alabama SIP at issue in *Nat'l Parks & Conservation*, regulates construction separately from operation. *See* La. Admin. Code tit. 33, pt. III, §§ 509 (construction), 507 (operation). Although a PSD permit is necessary for construction of a major source, a Part 70 permit is required for its operation. Given that dichotomy, the statutory provisions governing

35

preconstruction PSD permits "cannot reasonably be construed to
mean that building or altering a [facility] without a permit is a
violation that continues as long as the [facility] exists or is
operated." *Nat'l Parks & Conservation*, 504 F.3d at 1323. Thus,
Count VII must be dismissed as barred by the statute of
limitations because the alleged violations occurred before 2003.

2. Count V

Count V alleges that Zen-Noh failed to provide correct
information in its application for the Air Permit before the
permit was issued and failed to correct and supplement
information later when modifications to the permit were allegedly
required. The claim alleges violation of La. Admin. Code tit. 33,
pt. III, § 517, which requires a permit application to be
submitted and a permit granted before "commencement of
construction, reconstruction, or modification" of any new or
modified source. Section 517 also requires "any applicant who
fails to submit any relevant facts or who has submitted incorrect
information in a permit application [to], upon becoming aware of
such failure or incorrect submittal, promptly submit such
supplementary facts or corrected information." These provisions
regulate the conduct of an applicant before it receives a valid
permit. As in the case of Count VII, violation of these
provisions occurs at the time construction of a source begins, or

at the time of a modification. *See Nat'l Parks & Conservation Ass'n, Inc.,* 502 F.3d at 1322-23 (violation of preconstruction permitting requirements do not constitute continuing violations). Construction of the Grain Elevator began in 1979, and the First Amended Complaint does not identify any major modifications that occurred within the statutory period. Thus, Count V is barred by the statute of limitations and is dismissed.

3. Count VI

   Count VI alleges that actual emissions from Zen-Noh have exceeded the permitted emissions. In particular, Nucor alleges that "any violation of the PM-10 emission limits of the Air Permit is a violation of General Condition 1 of the Permit, La. Admin. Code tit. 33, § 501, La. Rev. Stat. Ann. §§ 30:2055 and 2057, and [Sections] 110 and 113 of the Clean Air [Act.]" Although its language is indefinite, Count VI seemingly alleges that Zen-Noh violated the PM-10 emissions limits contained in the Air Permit. Violations of this emission standard could occur on an ongoing basis, including within the statutory period. Unlike Counts VII and V, the violation alleged in Count VI is not limited to preconstruction or pre-modification conduct. Thus, although 28 U.S.C. § 2462 bars all claims based on emissions occurring more than five years before the filing of this lawsuit, it does not bar claims based on emissions occurring within five

years of the filing of the complaint. *See United States v. Marine Shale Processors*, 81 F.3d 1329, 1357 (5th Cir. 1996) (Section 2462 does not bar minor source fines for emissions occurring within five years of the filing of the lawsuit).

In support of Count VI, Nucor alleges that Zen-Noh's actual emissions of PM-10 are 292.7 tpy and exceed the 250 tpy limit imposed by the Louisiana SIP and the federally approved Title V program.[57] Zen-Noh argues that the Court should dismiss this count because it is not supported by sufficient factual allegations. To the contrary, Nucor alleges that the 292.7 tpy allegation is based on information provided by Zen-Noh in its 1995 and 2012 permit applications, "corrected to utilize appropriate emissions factors, capture efficiencies, and control efficiencies and ... account for fugitive emissions from truck traffic, scalping piles and other sources."[58] These allegations create a factual basis for Nucor's Count VI claim. As Zen-Noh argues, it is somewhat suspect that Nucor first alleged PM-10 of 292.7 tpy in its Amended Complaint, only after Zen-Noh pointed out in its motion to dismiss that grain elevators are subject to a PM-10 emissions limit of 250 tpy. However, the Court is not able to make credibility determinations on a motion to dismiss. At this stage, the Court must accept well-pleaded facts as true

---

[57] R. Doc. 46 at 17.

[58] *Id.*

and draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009). Under this standard, the Court finds the Count VI allegations plausible and denies the motion to dismiss this count.

**E. Count VIII**

Count VIII states that "[u]pon information and belief, Zen-Noh is operating under an expired air permit."[59] Zen-Noh has moved to dismiss this claim. Nucor has filed a motion for partial summary judgment on this issue, urging the court to grant Nucor summary judgment that "Zen-Noh has not renewed its Air Permit as required by law and it has now lapsed."[60]

The Court does not have subject matter jurisdiction over this Section 7604(a)(1) citizen suit claim because Nucor did not provide at least 60 days notice of this alleged violation before filing its First Amended Complaint. Under the Clean Air Act's citizen suit provision, at least 60 days before filing suit, the citizen plaintiff must give "notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order" allegedly violated. 42 U.S.C. § 7604(b)(1)(A); 40 C.F.R. §

---

[59] *Id.* at 37.

[60] R. Doc. 79 at 2.

54.3(b) (2004). "The notice requirements are strictly construed to give the alleged violator the opportunity to correct the problem before a lawsuit is filed." *Nat'l Parks & Conservation Ass'n, Inc.,* 502 F.3d at 1335 (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, Inc., 484 U.S. 49, 60, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987)).

Nucor issued a notice of intent to sue on April 30, 2012.[61] However, this notice did not allege that Zen-Noh failed to renew its Air Permit or was operating under an expired permit.[62] Nucor for the first time mentions this claim in its First Amended Complaint.[63] Nucor's amended notice of intent to sue was filed on the same day as the First Amended Complaint and thus did not provide the required 60-day notice.[64] Because Nucor failed to provide the advance notice required under § 7604(b), Count VIII must be dismissed.

Because Nucor's claim that Zen-Noh's Air Permit expired is dismissed, Nucor's motion for summary judgment on the issue is denied.

**F. Count IX**

---

[61] R. Doc. 46-1.

[62] *See id.*

[63] R. Doc. 46.

[64] R. Doc. 46-3.

40

Count IX alleges:

Upon information and belief, Zen-Noh is operating or
has operated the wood chip storage yard with emissions
of VOC and particulate matter with unauthorized
emissions and without appropriately identifying the
criteria pollutant and toxic air pollutant emissions
associated with such operation in its permit
application. Such operation violated and/or is in
violation of LAC 33:III.501 and the Louisiana SIP.[65]

The allegations related to VOC emissions included in the original

and amended complaint are as follows:

It is believed that Zen-Noh also failed to
adequately characterize Volatile Organic Compound
("VOC") and particulate matter (PM and PM10) emissions
from its woodchip handling, storage, reclamation and
transportation operations as well. Zen-Noh initially
added a 9.5 acre storage slab for the storage and
reclamation of wood chips in 1995. The capacity of the
storage pile was then 160,000 tons. Zen-Noh represented
that there would be no air emissions associated with
the wood chip storage or handling operations in the
1995 permit application. In 2000, Zen-Noh expanded the
storage slab to 15 acres and the capacity to 240,000
tons. Zen-Noh indicated in its application that the
emissions from wood chips were minimal. The storage
slab is not a permitted point source or fugitive
emission source in the current permit. However, most
pulp and paper mills in the State of Louisiana and most
wood yards storing similar materials include relatively
significant VOC emissions estimates in their permits.
Several pulp/paper mills have permit limits of over 100
tpy VOC for their wood chip storage piles and PM10
emissions ranging from 1-5 tpy.[66]

These allegations are speculative. Nucor's allegation that

pulp mills, paper mills, and wood yards "storing similar

--------

[65] R. Doc. 46 at 37.

[66] *Id.* at 24-25.

materials include relatively significant VOC emissions estimates in their permits,"[67] does not support the reasonable inference that Zen-Noh's VOC emissions exceed its permitted levels. *Iqbal,* 129 S.Ct. at 1940. The comparison of Zen-Noh's wood chip operation to unrelated facilities without factual allegations establishing the appropriateness of such a comparison does not raise the right to relief beyond a speculative level. *Twombly,* 550 U.S. at 555. Thus, Count IX must be dismissed.


## IV.  CONCLUSION

Given all of the foregoing reasons, the Court grants Zen-Noh's motion to dismiss Counts I-III, Count V, and Counts VII-IX, and denies the motion to dismiss Counts IV and VI of the First Amended Complaint.


New Orleans, Louisiana, this 17th day of July, 2013.

*Sarah Vance*

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[67] *Id.*

42