UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


ZEN-NOH GRAIN CORPORATION                    CIVIL ACTION

VERSUS                                       NO: 12-1011

CONSOLIDATED ENVIRONMENTAL                   SECTION: R(1)
MANAGEMENT, INC. - NUCOR STEEL
LOUISIANA


**ORDER AND REASONS**

The parties in this case are feuding neighbors with property
next to each other on the Mississippi River in St. James Parish.
Defendants, Consolidated Environmental Management, Inc., Nucor
Corporation, Nucor Big Iron Holdings, Inc., and Nucor Steel
Louisiana, LLC (collectively "Nucor") are constructing a steel
production facility that Zen-Noh has vigorously opposed. Zen-Noh
filed this suit to enjoin Nucor from constructing a proposed
direct reduced iron ("DRI") manufacturing unit. Zen-Noh alleged
that the requirements of the Clean Air Act (CAA) and the
federally enforceable Louisiana State Implementation Plan (SIP)
had not been met with regard to the proposed unit. The Court
denied Zen-Noh's motion for summary judgment and dismissed Zen-
Noh's claims as unripe.[1]

---

[1] R. Doc. 25-1.

Zen-Noh now moves for reconsideration of the Court's order dismissing the complaint.[2] Specifically, Zen-Noh argues that the suit was ripe and asks the Court to reinstate Zen-Noh's claim for civil penalties and attorney's fees. Nucor opposes the motion and moves the Court to alter judgment from "without prejudice" to "with prejudice."[3] For the following reasons, the Court DENIES Zen-Noh's motion and GRANTS Nucor's motion.

## I. Background

### A.   STATUTORY BACKGROUND

Congress enacted the Clean Air Act ("CAA") "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401(b)(1). The Act is a comprehensive program for controlling and improving the nation's air quality. Under the Act, the Administrator of the Environmental Protection Agency identifies air pollutants that endanger the public health or welfare, determines what concentrations of those pollutants are safe, and codifies those safety determinations as National Ambient Air Quality Standards (NAAQS). *See* 42 U.S.C. §§ 7408, 7409. The Act then delegates to the states "primary responsibility for assuring air quality" within their respective boundaries, and requires each state to

_____

[2] R. Doc. 76.

[3] R. Doc. 95.

develop a State Implementation Plan (SIP) "which will specify the manner in which [the NAAQS] will be achieved and maintained." 42 U.S.C. § 7410(a). Upon approval by the EPA, a State Implementation Plan becomes federally enforceable law. *Louisiana Envtl. Action Network v. EPA*, 382 F.3d 575, 579 (5th Cir. 2004); *Kentucky Res. Council, Inc. v. EPA*, 304 F. Supp. 2d 920, 923 (W.D. Ky. 2004); *Sweat v. Hull*, 200 F. Supp. 2d 1162, 1164 (D. Ariz. 2001).

Although the states "have 'wide discretion' in formulating their plans," *Alaska Dept. of Environmental Conservation v. EPA*, 540 U.S. 461, 470 (2004) (quoting *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976)), the CAA mandates that all State Implementation Plans include certain features. Of relevance here, the Act provides that each State Implementation Plan shall "meet the applicable requirements" of what is known as the Prevention of Significant Deterioration of Air Quality (PSD) program. 42 U.S.C. § 7410(a)(2)(J); *see also* 42 U.S.C. § 7471. The PSD program, which applies to areas where the ambient level of air pollution already meets the NAAQS, *see* 42 U.S.C. § 7471, was "designed to ensure that the air quality in attainment areas or areas that are already 'clean' will not degrade." *Alaska Dept. of Environmental Conservation*, 540 U.S. at 470 (quoting BELDEN, CLEAN AIR ACT 43 (2001)). It prescribes certain substantive and procedural requirements that must be met before construction may

begin on a new "major emitting facility." *See* 42 U.S.C. §§ 7475, 7479(1).  The PSD review process requires a demonstration that "emissions from construction or operation of such facility will not cause, or contribute to, air pollution" above the maximum allowable increment for the local air quality area, the national ambient air quality standards (NAAQS), or any other applicable emission standard. *Id.* § 7475(a)(3). A critical requirement of the PSD application review process is a determination that the proposed facility will be outfitted with the best available control technology ("BACT")[4] for pollutants. 42 U.S.C. § 7475(a)(4).  The restrictions on emissions included in a PSD are based on the determination of BACT. *Id.*

Although the PSD program relates to preconstruction permits, Title V of the CAA deals with operating permits. 42 U.S.C. §§ 7661–7661f. As with the PSD program, Louisiana has a corresponding Title V operating permit program (also known as the Part 70 Permit program). LAC 33:III Chapter 5. Part 70 does not set forth any new requirements for source operators; it is designed to have all emissions limitations and applicable PSD provisions (such as BACT) in one easily accessible location. It

---

[4] "BACT, is defined in the CAA as "an emission limitation based on the maximum degree of [pollutant] reduction ... which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for [the] facility ...." 42 U.S.C. § 7479(3).

is unlawful to operate without a Part 70 operating permit or to operate except in compliance with an operating permit issued under Part 70. The PSD and Part 70 permit programs are incorporated into Louisiana rules under Louisiana Administrative Code title 33, part II, Ch. 5 ("Louisiana SIP"), which has been approved as satisfying the requirements of the Federal Clean Air Act, 42 U.S.C. § 7411 *et seq.* All parties agree that the PSD and Part 70 requirements apply to the proposed DRI plant at issue in this litigation.

The CAA contains three citizen suit provisions. One of the provisions allows for suit against the EPA Administrator "where there is alleged a failure of the Administrator to perform a duty under" the CAA. *Id.* § 7604(a)(2). The other two provisions allow suit in federal district court against any person who is alleged to have violated an emission standard of the CAA. Section 7604(a)(3) allows for immediate suit against someone who is alleged to be constructing or operating a major source of emissions without or in violation of a PSD permit. Section 7604(a)(1) allows suit based on a range of CAA violations, including violation of PSD permits, Part 70 permits, and the NAAQS. Although a 7604(a)(3) action can be brought immediately, suit under the broader 7604(a)(1) requires that the plaintiff give 60 days notice to the EPA Administrator, to the State in

which the violation occurs, and to any alleged violator of the standard, limitation, or order. *Id.* § 7604(b)(1)(A).

**B.    FACTUAL BACKGROUND**

The instant matter involves a proposed DRI facility. The facility will consist of two DRI units, each of which qualifies as a "major emitting facility" for which a PSD permit and a Part 70 permit are required.

On August 20, 2010, Nucor first applied for PSD and Part 70 permits for the DRI plant.[5] In its initial application Nucor indicated that it planned to use a DRI process which incorporates an external reformer, such as the Midrex process. The applications included calculations and process drawings pertaining only to the Midrex process. Nucor also explained in the Part 70 permit application that it was

> ...investigating the potential of a DRI process which does not require a reformer as part of the design. In the place of the reformer, a process heater provides the energy input necessary to heat the furnace, which requires less heat input than a standard reformer design. However, this technology remains unproven, and new units based on this design have yet to be built. Nucor reserves the right to select and implement this competing technology at the Nucor Direct Reduced Iron Facility after a thorough investigation of its potential and reliability. Due to the lower energy requirements claimed by the vendor, it is expected that

---

[5] LDEQ received the initial application on August 20, 2010. After twice receiving additional information for Nucor, LDEQ considered the application effectively complete on November 8, 2010. R. Doc. 25-2 at 9.

emissions from a reformerless DRI unit would be lower
than that of a standard design including a reformer,
and so the emissions presented with this application
are conservative. Nucor will notify the Louisiana
Department of Environmental Quality in a timely manner
of the DRI process design selection made for the Nucor
Direct Reduced Iron Facility.[6]

The alternative design described above is referred to by the

parties as the HYL process.

Following receipt of the permit applications, LDEQ provided

an opportunity for public comment on the permits as required by

the Louisiana SIP. La. Admin Code. tit. 33, pt. III, 509Q.

Several commenters questioned the choice between the HYL

reformer-less technology and the Midrex process. One comment

reads:

The original October 2010 application states that Nucor
is requesting authorization to construct a reformer-
based DRI plant, but is also seeking authority to
construct in the alternative, a reformer-less HYL
process unit.  We did not see this other process
discussed in the draft PSD permit, [or] Title V permit.
Please clarify whether this inherently less polluting
process was considered in the Best Available Control
Technology (BACT) determination.[7]

LDEQ responded:

LDEQ received no calculations or process drawings
pertaining to a reformerless design. Permit Nos. 3086-
V0 [Part 70] and PSD-LA-751 [PSD] only authorize
construction and operation of the emissions units

---

[6] R. Doc. 29 at 3.

[7] R. Doc. 25-4 at 56-57.

7

addressed therein; they do not allow Nucor to construct reformerless process units.

The HYL process was considered by Nucor and may result in fewer emissions of greenhouse gases; however, this process is still experimental and has never been attempted at a DRI facility of the size that Nucor is considering.[8]

In response to similar comments, LDEQ reiterated that "[t]he applicant has not presented such an alternative design, ... and is not permitted to construct and operate such an alternative design by the approved PSD and Title V permits,"[9] and "PSD-LA-751...do[es] not allow Nucor to construct reformerless process units."[10]

On January 27, 2011, LDEQ issued PSD and Part 70 permits for the construction and operation of the two DRI plants.[11] The PSD permit contains a multi-step analysis determining the BACT for each regulated pollutant, a summary table of the selected BACT for each pollutant, and maximum allowable emission rates based on the BACT determinations.[12]

Subsequently, Nucor decided to construct the first of the two DRI plants utilizing the new technology licensed by HYL. On

---

[8] *Id.* (quotations omitted).

[9] *Id.* at 191.

[10] *Id.* at 28.

[11] R. Doc. 25-2; R. Doc 25-3.

[12] R. Doc. 25-2 at 11-72, 78-81.

September 29, 2011, Nucor submitted an application with LDEQ to modify its Part 70 permit in accordance with the changed plans.[13] Both parties acknowledge that the HYL process is likely to be more efficient and have lower emissions than the Midrex process.[14] The primary difference in the HYL technology is that natural gas is reformed internally, rather than externally, as in the Midrex process. As Nucor explains:

> External reforming is accomplished via a process heater containing catalyst in the heater tubes while the in situ [internal] reforming utilizes a smaller process heater (still external) which simply heats the natural gas in the heater tubes without the catalyst; the natural gas reforming reaction occurring later in the process or "in situ" with the iron ore raw material in the shaft furnace.[15]

The HYL process "substitutes in place of the reformer a process heater with a lower firing rate, and allows for the substitution of a smaller package boiler than that required by the traditional process."[16]

On March 8, 2012, LDEQ issued a modified Part 70 permit authorizing the construction and operation of the unit with the

---

[13] R. Doc. 25-5; R. Doc. 29 at 4.

[14] R. Doc. 29 at 15; R. Doc. 25-1 at 12.

[15] R. Doc. 33-5.

[16] R. Doc. 25-5 at 1-2.

HYL process.[17] The modified part 70 permit wholly adopts the changes and limitations proposed by Nucor in its application for the modification. The changes to the permit include replacing the reformer with a process heater, which has a lower heat input, and replacing the package boiler with a smaller one with a lower heat input. The emissions limits for four emissions points, the furnace dust collection (DRI-107), the process heater (DRI-108), the package boiler flue stack (DRI-109), and the hot flare (DRI-110) are changed.[18] Limits for the first three emission points demonstrate substantial reductions for most of the criteria pollutants, while the hot flare emissions limits have mostly increased.[19] LDEQ classified the modification of the Part 70 permit as a "minor modification," for which public notice was not required.[20]

Because the Part 70 permit program is designed to be an accumulation of all the emissions limitations associated with a facility, in considering the Part 70 modification LDEQ evaluated its compliance with the PSD program along with Louisiana Air Quality Regulations, New Source Performance Standards, and

---

[17] R. Doc. 25-6.

[18] Compare R. Doc. 25-3 at 23, with R. Doc. 25-6 at 27.

[19] *Id.*

[20] R. Doc. 25-6 at 6.

National Emission Standards for Hazardous Air Pollutants.[21] The parties disputed whether LDEQ considered actually modifying the PSD permit when it evaluated the Part 70 modification. Plaintiff alleged that "Nucor did not request, and LDEQ did not issue, a revised PSD permit...to reflect the differences between the Midrex and HYL process."[22] Defendants pointed to LDEQ's statements issued after the Part 70 modification that it reviewed the PSD permit and determined that modification was unnecessary because the initial BACT determinations were unchanged.[23] Neither party pointed to an LDEQ statement regarding whether the need for PSD modification was considered that was made during the period the Part 70 modification was under consideration.

In early 2012, Nucor allegedly began construction of the HYL DRI unit with the new technology and the original PSD permit still in place.[24] On June 21, 2012, LDEQ decided to reopen the PSD permit. In a letter announcing the reopener, LDEQ stated:

> At the time [of the Part 70 modification], LDEQ also
> reviewed the PSD permit for the DRI facility, PSD-LA-
> 751, to determine if it should be modified in the same
> fashion. Despite being aware of previous statements

---

[21] *Id.*

[22] R. Doc. 25-1 at 6.

[23] R. Doc. 29-1 at 1.

[24] Nucor's application for modification of the Part 70 permit, dated September 29, 2011 stated that "Nucor has recently commenced construction of the permitted facility, and expects to begin operations in 2013." R. Doc. 25-5 at 2.

that the PSD permit did not allow Nucor to construct
reformerless process units, based on LDEQ's review of
the application and inquiries about the HYL design,
LDEQ concluded that because its initial best available
control technology (BACT) determinations remained
appropriate, it was not necessary to modify this
permit.[25]

Nevertheless, LDEQ said that the degree of public interest in the
project prompted its decision to reopen the permit "for the
limited purpose of confirming LDEQ's initial assessment."[26] In
reopening the permit, LDEQ called for Nucor to submit an analysis
demonstrating that "BACT for the HYL equipment is not more
stringent than that provided by PSD-LA-751, and ... [the] use of
HYL equipment in one unit of the DRI facility does not materially
change the original air quality analysis."[27] Alternatively, LDEQ
invited Nucor to identify and justify any necessary revisions to
the existing PSD permit. The reopener states:

> If LDEQ ultimately determines that no changes to the
> existing BACT determinations are warranted, PSD-LA-751
> will be revised to clarify that it covers the HYL
> equipment. If LDEQ determines that BACT for the HYL
> equipment is more stringent than that currently
> provided by the PSD permit, or that use of HYL
> equipment in one unit of the DRI facility results in
> adverse air quality impacts, LDEQ will stay the permit
> or portions of the permit as necessary and propose a

---

[25] R. Doc 29-1 (quotations omitted).

[26] *Id.*

[27] *Id.*

revised permit establishing appropriate terms and conditions.[28]

LDEQ also announced an opportunity for public comment on the reopened permit.

> In accordance with LAC 33:III.529.A.2, proceedings to reopen a permit shall affect only those parts of the permit for which cause to reopen exists. Therefore, public comment shall be limited solely to the issues addressed herein and to any other revisions to the permit proposed by LDEQ.[29]

After reopening the PSD permit and receiving the requested analysis from Nucor, LDEQ issued a draft modified PSD permit for public comment.[30] In the draft, LDEQ reiterates that at the time LDEQ approved Nucor's application and modified the Part 70 permit, "LDEQ also reviewed the PSD permit...to determine if it should be modified in the same fashion."[31] "LDEQ concluded that because its initial...BACT determinations remained appropriate, it was not necessary to modify the PSD permit."[32]  The draft PSD permit states:

> Based upon additional information provided by Nucor on July 20, 2012, LDEQ has again concluded that no changes to the existing BACT determinations are warranted ...

---

[28] *Id.*

[29] *Id.*

[30] R. Doc. 33-5 (Draft PSD-LA-751(M-1)).

[31] *Id.* at 2

[32] *Id.* at 3.

and that use of in situ reforming equipment in one unit of the DRI plant does not result in adverse air quality impacts.  Therefore LDEQ proposes to revise the PSD-LA-751 only to clarify that it covers the in situ reforming equipment.[33]

The draft modified PSD permit lays out the top down BACT process for determining the most stringent control technique for each emission point. The draft "replicates the [BACT] analysis documented in PSD-LA-751 [the original PSD permit], modified to reflect that DRI Unit No. 1 will be an in situ reforming design."[34]  Unlike the earlier Part 70 modification which was classified as a minor modification, the PSD draft indicates that the LDEQ "has made a preliminary determination to approve the construction of the *major* modification."[35]

The changes in design led to some differences in the BACT analysis and emissions limits for the HYL unit (in the Draft revised permit) compared to the analysis in the original PSD permit. For example, the BACT analysis of the DRI reformer was removed and replaced by BACT analysis for

---

[33] *Id.*

[34] *Id.* at 9.

[35] *Id.* at 7 (emphasis added).

14

the Process Heater.[36] In its submissions to LDEQ for

consideration in the reopener, Nucor stated:

> The only difference [between the Midrex and HYL
> designs] is where the natural gas reformer is
> located and the impact that the type of reformer
> has on the overall process emissions. ...[The HYL]
> unit has 15 emission points for which BACT was
> evaluated.  All but five of these remain identical
> for either type of natural gas reforming.
> Consequently, the BACT evaluation for these
> emission points also remains unchanged. The
> remaining five emission points are slightly
> different depending on whether an in situ or
> external reformer is utilized on the DRI plant.[37]

The briefing sheet of the draft permit provides a summary of the

changes including: 1) replacement of the reformer with a process

heater; 2) reduction of the PM10/PM2.5 BACT limit for the new

Process Heater; 3) deletion of the upper seal gas vent; 4)

removal of seal gas emissions from the furnace dust collection;

5) lowering of the firing rate of the package boiler; and 6)

revision of the emissions limitations for the hot flare to

reflect that the flare will now be used only for startup and

shutdown operations rather than intermittently.[38] Also, the

generally more stringent emissions limits from the Part 70 permit

modification are included in the PSD draft.

---

[36] R. Doc. 33-5 at 116.

[37] *Id.* at 112.

[38] *Id.* at 7.

15

**THE COURT's SUMMARY JUDGMENT RULING**

When the Court ruled on Zen-Noh's motion for summary judgment, the record reflected that LDEQ had not yet issued a final PSD permit authorizing the HYL changes. The Court held that the suit should be dismissed because Zen-Noh's claims were not ripe for adjudication. Ripeness is a constitutional justiciability doctrine that "prevent[s] the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580 (1985) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977)). Ripeness doctrine directs against deciding cases which are abstract or hypothetical, as opposed to definite and concrete. *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003). The Supreme Court has expressly recognized that one purpose of the doctrine is "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories*, 387 U.S. at 148-49.

In finding Zen-Noh's suit unripe, the Court found that Zen-Noh failed to demonstrate that any hardship would result from withholding adjudication until the agency proceedings had finished. The Court found that the reopening of the permit by LDEQ addressed Zen-Noh's contentions that no BACT analysis for

16

HYL process was conducted, that air quality limitations are more stringent for the HYL process, and that Zen-Noh was denied the right to comment publicly on the substitution of the HYL process for the Midrex process. In reopening the permit, LDEQ required Nucor to submit BACT and air quality analysis specific to the HYL process and provided for a public comment period. Further, the draft PSD contained the more stringent emissions limitations from the modified Part 70 permit that Zen-Noh sought. Therefore, the Court concluded, if the LDEQ issued a final PSD permit that looked like the draft, "plaintiff will have received what it said it wanted: more stringent emissions limitations and the ability to file an immediate citizen suit under § 7604(a)(3) if they are violated."[39] The Court also found that any injury resulting from beginning to operate the plant before LDEQ issued a new PSD permit "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."[40] The Court determined that the suit was "unripe because any hardship to the parties is 'abstract and hypothetical.'"[41]

---

[39] R. Doc. 65 at 22.

[40] *Id.* at 23 (citing *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation and internal quotation marks omitted).

[41] *Id.* (citing *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003)).

The Court also concluded that judicial review of the merits of Zen-Noh's claim would interfere with agency action. The Court noted that LDEQ had stated a preliminary determination that the initial PSD permit allowed for construction of the HYL plant and the purpose of the reopener was to weigh additional information and determine whether modification was necessary, and if so, in what ways.[42] Thus, the Court found that further litigation in this Court would have interfered with and duplicated the ongoing state administrative proceedings. The Court also noted that "deciding the merits of this case without access to the fully developed agency record would ... be imprudent."[43]

**THE FINAL PSD PERMIT**

In its motion for reconsideration, Zen-Noh indicates that LDEQ issued a final PSD permit to Nucor on November 16, 2012, almost a month before the Court issued its Order and Reasons dismissing Zen-Noh's claims.[44] The LDEQ mailed public notification of the final permit decision on December 14, 2012, two days after the Court issued its order. The final permit incorporates the more-stringent BACT emission limits proposed in the draft PSD permit and includes a requirement to spray water onto the material in the hold of ships being unloaded and to

---

[42] R. Doc. 29-1 at 1; R. Doc. 33-5 at 2.

[43] R. Doc. 65 at 25.

[44] R. Doc. 76-4.

install wind shields on conveyor hoppers.[45] The LDEQ stated that "LDEQ has again concluded that no changes to the existing BACT determinations are warranted and that use of in situ reforming equipment in one unit of the DRI plant does not result in adverse air quality impacts."[46] Therefore, LDEQ "revise[d] PSD-LA-751 only to clarify that it covers the in situ reforming equipment."[47]

Zen-Noh now argues that its claims were ripe when the Court issues its order and, although the final permit moots the claim for an injunction, Zen-Noh's claims should be reinstated for trial on the amount of civil penalties.

## II. Legal Standard

Federal Rule of Civil Procedure 54(b) provides that an order that adjudicates fewer than all the claims among all the parties "may be revised at any time" before the entry of a final judgment. Fed.R.Civ.P. 54(b). As Rule 54 recognizes, a district court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *Melancon v. Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir. Unit A Oct. 1981). Although the district court's discretion

---

[45] *Compare* R. Doc. 33-5 at 72-73, *with* R. Doc. 76 at 73-76.

[46] R. Doc. 76-4 at 5.

[47] *Id.*

in this regard is broad, *see Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1414-15 (5th Cir. 1993); *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) (en banc), it is exercised sparingly in order to forestall the perpetual reexamination of orders and the resulting burdens and delays. *See generally* 18b Charles A. Wright et al., Federal Practice & Procedure: Jurisdiction § 4478.1 (2d ed.2002).

This Court generally evaluates motions to reconsider interlocutory orders under the same standards that govern Rule 59(e) motions to alter or amend a final judgment.[48] Although there may be circumstances in which a different standard would be appropriate, the present motion does not present such circumstances. *See, e.g., American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-16 (4th Cir. 2003) ("true declaratory judgments ... trigger heightened standards for reconsideration"). The proper inquiry is therefore whether the moving party has

---

[48]   *See, e.g., Rosemond v. AIG Ins.*, No. 08-1145, 2009 WL 1211020, at *2 (E.D. La. May 4, 2009) (Barbier, J.); *In re Katrina Canal Breaches Consol. Litigation*, No. 05-4182, 2009 WL 1046016, at *1 (E.D.La. Apr.16, 2009) (Duval, J.); *Total Sleep Diagnostics, Inc. v. United Healthcare Ins. Co.*, No. 06-4153, 2009 WL 928646, at *2 (E.D.La. Mar.31, 2009) (Fallon, J.); *Town of Gramercy v. Blue Water Shipping Services*, No. 07-2655, 2009 WL 580445, at *1 (E.D.La. Mar.4, 2009) (Engelhardt, J.); *Letap Hospitality, L.L.C. v. Days Inn Worldwide, Inc.*, No. 08-1355, 2008 WL 2959649, at *2 (E.D.La. July 30, 2008) (Berrigan, J.).

"clearly establish[ed] either a manifest error of law or fact or ... present[ed] newly discovered evidence." *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005) (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)). A motion to reconsider is "not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of [the order]." *Templet v. HydroChem Inc.*, 367 F.3d 473, 478–79 (5th Cir. 2004).

## III. Discussion

### A. Ripeness

That LDEQ had issued a final permit at the time the Court issued its order and reasons impacts the ripeness analysis. In considering ripeness, events that occurred after the filing of the complaint can be considered. *See* 13B CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 3532.7 (3d ed. 2008); *See also Buckley v. Valeo*, 424 U.S. 1, 113-114 (1976) ("Ripeness questions are peculiarly questions of timing, and could properly be resolved by considering events ... that intervened between consideration by the court of appeals and decision by the Supreme Court"). "We note that it is irrelevant whether the case was ripe for review when the complaint was filed." *American Motorists Ins. Co. v. United Furnace Co., Inc.*, 876 F.2d 293, 302 n. 4 (2d Cir. 1989), citing WRIGHT ET AL. In dismissing Zen-Noh's claims, the

Court found that it lacked jurisdiction because the agency had yet to conclude the permitting process. Had the record reflected that LDEQ had already issued a final PSD permit, the case would have been ripe at the time of the Court's order.

## B. Mootness

Although LDEQ had, unbeknownst to the Court, issued a final permit, dismissal is nevertheless required under the related justiciability doctrine of mootness. Mootness is the doctrine of standing in a time frame. *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008). "The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness).'" *Id.* (citing *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006)). If a case has been rendered moot, a federal court has no constitutional authority to resolve the issues that it presents.  *In re Scruggs*, 392 F.3d 124, 128 (5th Cir. 2004). As a general rule, "any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot." *Carmouche*, 449 F.3d at 661. A case should not be declared moot "[a]s long as the parties maintain a 'concrete interest in the outcome' and effective relief is available to remedy the effect of the violation ...." *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 227

22

(5th Cir. 1998). But a case will become moot when "there are no longer adverse parties with sufficient legal interests to maintain the litigation," or "when the parties lack a legally cognizable interest in the outcome" of the litigation. *In re Scruggs*, 392 F.3d at 128. As the Supreme Court has noted, "it is not enough that a dispute was very much alive when the suit was filed; ... [t]he parties must continue to have a personal stake in the outcome of the lawsuit." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990) (citations and internal quotation marks omitted).

Under Fifth Circuit law, the test for mootness depends on whether or not it is the defendant's *voluntary* conduct that moots the plaintiff's suit. When the defendant's voluntary conduct brings it into compliance, the test is stringent. *Envtl. Conservation*, 529 F.3d at 527. In that situation, "the defendant must demonstrate that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* Under this standard, the party asserting mootness bears the "formidable burden" of showing that its alleged violations of the CAA cannot reasonably be expected to recur. *Id.* (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189–90 (2000)). This stringent standard is appropriate when considering voluntary cessations of CAA violations because it "protects plaintiffs from defendants who seek to evade sanction

23

by predictable protestations of repentance and reform." *Envtl.*
*Conservation*, 529 F.3d at 527.

The voluntary standard does not apply here because the Court
is not relying on Zen-Noh's assurances that it will not return to
its old ways. *See id.* Here, LDEQ has issued a final PSD permit
authorizing construction and operation of a plant using the HYL
process. Further, LDEQ reopened Nucor's permit on its own accord
after initially stating that a major modification was not
warranted. It was these actions by LDEQ that have rendered Zen-
Noh's suit moot, not any voluntary compliance by Nucor.

In circumstances such as these, Zen-Noh's claims are moot
unless Zen-Noh proves that there is a realistic prospect that the
violations alleged in its complaint will continue notwithstanding
LDEQ's actions. *Id.* at 228 (adopting the "realistic prospect"
mootness standard endorsed by the Second and Eighth Circuits).
The Fifth Circuit in *Environmental Conservation* applied this test
in similar circumstances. In that case, the district court found
that a consent decree resolved every violation alleged in the
plaintiff's Clean Water Act suit against the City of Dallas. *Id.*
at 529. Plaintiffs argued that the suit was not mooted by the
consent decree based on evidence of repeated past violations by
the city. *Id.* The court found that the consent decree addressed
every permit and Clean Water Act violation alleged in plaintiff's
citizen suit. *Id.* Because the plaintiff could not show a

24

realistic prospect that "any of the violations alleged in the citizen suit [would] continue notwithstanding the consent decree," the Court found plaintiffs claims for both injunctive relief and civil penalties to be moot. *Id.*

As Zen-Noh concedes, its claims for injunctive relief have been mooted. Zen-Noh argues that its claims for civil penalties should not be deemed moot because Nucor's alleged violations of the PSD program are capable of repetition. However, Nucor has acted at all times pursuant to authorization of LDEQ. When reviewing Nucor's September 29, 2011 application to modify the DRI Part 70 permit, LDEQ stated that it also specifically reviewed PSD-LA-751 and determined that it did not require modification because the BACT determinations remained appropriate. When the LDEQ opened the PSD permit due to the public interest, it "again concluded that no changes to the existing BACT determinations are warranted."[38] LDEQ also stated that "because its initial ... BACT determinations remained appropriate, it was not necessary to modify the PSD permit ... Therefore, LDEQ proposed to revise PSD-LA-751 only to clarify that it covers the in situ reforming equipment."[39] Given that LDEQ found Nucor to be in compliance with the CAA and the

---

[38] R. Doc. 76-4 at 5.

[39] *Id.*

Louisiana SIP at all times, the deterrent effect of allowing Zen-Noh's claims for civil penalties to go to trial is non-existent.

The Tenth Circuit's reasoning in *WildEarth Guardians v. Pub. Serv. Co. of Colorado*, 690 F.3d 1174, 1178 (10th Cir. 2012), is instructive. The plaintiff in *WildEarth* had initially been in compliance with all applicable laws when construction of its power plant began, but then a decision of the D.C. Circuit required regulators to impose additional CAA requirements on power plant construction. *Id.* at 1178. After the decision, plaintiff worked with the relevant state agencies to come into compliance with the modified regulatory regime while construction of the plant continued. The *WildEarth* court considered whether plaintiff's civil suit under the CAA was mooted when the defendant came into compliance with the regulatory scheme. The court noted that "in most citizen suits, a plaintiff's claim for civil penalties is not rendered moot by the defendant's compliance with the law because the plaintiff retains a concrete interest in deterring the defendant from future violations." *Id.* at 1186. The court nevertheless found that an exception applied in *WildEarth* because the defendant's actions did "not suggest a likelihood of future unlawful conduct needing to be deterred." *Id.* at 1187. The court reasoned that the plaintiff had previously gone above and beyond what was required in attempting to accommodate environmental interests, that its alleged non-

26

compliance was precipitated by events outside of its control, and that the particular violation alleged was unlikely to be repeated. *Id.* at 1186-87.

Similar factors are present here. Nucor has participated in LDEQ's permitting process from the beginning. Indeed, its alleged violation was switching from an old technology to a new process that the parties agree has generally lower emissions. In light of these circumstances, the Court concludes that Nucor's alleged unlawful conduct is not reasonably likely to recur. Therefore, Zen-Noh's claims for civil penalties, even if successful, would have no deterrent value, and would serve only the public's generalized interest in Clean Air Act compliance. *Id.* at 1187. But "a general interest common to all members of the public" does not satisfy Article III. *Id.*

## IV.  CONCLUSION

Given the forgoing reasons, the Court concludes that this case is moot. Therefore, Zen-Noh's motion for reconsideration is DENIED, and the complaint is DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this 31st day of July, 2013.

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE