UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CONSOLIDATED ENVIRONMENTAL                    CIVIL ACTION
MANAGEMENT, INC. - NUCOR STEEL
LOUISIANA

VERSUS                                        NO: 12-1011 c/w
                                              12-1738

ZEN-NOH GRAIN CORPORATION                     SECTION: R(4)

ORDER AND REASONS

Before the Court are defendant Zen-Noh Grain Corporation's
("Zen-Noh") motions to exclude the testimony of Timothy
Desselles,[1] Stephen Mattison,[2] Kimberly McIntyre,[3] Anna Migliore,[4]
Yousheng Zeng, Ph.D.,[5] Bill Palermo,[6] and Don Elias,[7] as well as
its motion for summary judgment.[8] Also before the Court is
plaintiff Consolidated Environmental Management Inc. - Nucor
Steel Louisiana's ("Nucor") motion in limine to preclude Zen-Noh
from introducing testimony or other evidence regarding Title V

---

[1] R. Doc. 220.

[2] R. Doc. 221.

[3] R. Doc. 222.

[4] R. Doc. 223.

[5] R. Doc. 224.

[6] R. Doc. 218.

[7] *Id.*

[8] R. Doc. 225.

permitting issues or "potential to emit" calculations.[9] For the following reasons, Zen-Noh's motions to exclude the testimony of Timothy Desselles, Stephen Mattison, Kimberly McIntyre, and Anna Migliore are granted. Zen-Noh's motion for summary judgment is also granted, and the remaining motions are denied as moot.

## I.    STATUTORY BACKGROUND

Congress created the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401(b)(1). The Clean Air Act, 42 U.S.C. §§ 7401, *et seq.,* is a comprehensive program for controlling and improving the nation's air quality. Under the Act, the Environmental Protection Agency ("EPA") identifies air pollutants that endanger the public health or welfare, determines the concentrations of those pollutants that are safe and promulgates those determinations as national ambient air quality standards ("NAAQS"). *See* 42 U.S.C. §§ 7408, 7409. Each state must ensure that its ambient air meets the appropriate NAAQS, *see* 42 U.S.C. § 7407(a), and must develop a state implementation plan ("SIP") to achieve the standards established by the EPA. *See* 42 U.S.C. § 7410(a). The Act requires state implementation plans to include "enforceable emission limitations and other control measures, means, or techniques . . . as well as schedules and

---

[9] R. Doc. 219.

2

timetables for compliance" to meet the NAAQS. 42 U.S.C. § 7410(a)(2)(A). Upon approval by the EPA, the state implementation plan becomes federally enforceable. *Louisiana Envtl. Action Network v. EPA,* 382 F.3d 575, 579 (5th Cir. 2004); *Kentucky Res. Council, Inc. v. EPA,* 304 F.Supp.2d 920, 923 (W.D. Ky. 2004); *Sweat v. Hull,* 200 F.Supp.2d 1162, 1164 (D. Ariz. 2001). For entities regulated under the Act, "[t]he burden is clearly on the source to do whatever is necessary to assure compliance." Emission Offset Interpretative Ruling, 45 Fed. Reg. 59,874, 59,877 (Sept. 11, 1980) (codified at 40 C.F.R. Part 51).

The Act also requires the EPA to develop new source performance standards to govern emissions of air pollutants from facilities that are constructed or modified after the publication of regulations. 42 U.S.C. § 7411(a)(2), (f). After the EPA promulgates a new source performance standard, it is "unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source." 42 U.S.C. § 7411(e). Relevant here are the performance standards for grain elevators set out in 40 C.F.R. Part 60, Subpart DD, and in particular, the 20% opacity limitation for fugitive emissions from ship and barge loading operations set out in 40 C.F.R. § 60.302(c)(4). The EPA developed and approved "Method 9," incorporated into the federal regulations at 40 C.F.R. Part 60, App. A, as the appropriate

reference test for determining compliance with this 20% opacity limit. 40 C.F.R. § 60.11(b).

Louisiana's EPA-approved Clean Air Act implementation plan, which has been incorporated into the federal regulations at 40 C.F.R. § 52.970, requires a permit for the discharge of air pollutants. La. Rev. Stat. Ann. § 30:2055. The Secretary of the Louisiana Department of Environmental Quality ("LDEQ") issues permits in accordance with federal and state law and LDEQ regulations. *Id.* § 30:2054. Louisiana's implementation plan prohibits the discharge of "air contaminants ... into the air of this state in violation of regulations of the secretary or the terms of any permit, license, or variance." *Id.* § 30:2057. The regulations include a 20% opacity limit for particulate matter from sources including barge and ship loaders, "except the emissions may have an average opacity in excess of 20 percent for not more than one six-minute period in any 60 consecutive minutes." La. Admin. Code tit. 33:III § 1311.C. The plan also provides that "[n]oncompliance with any term or condition of the permit shall constitute a violation of this Chapter and shall be grounds for enforcement action, for permit revision or termination, or for denial of a permit renewal application." *Id.* § 501.C.4. Finally, Louisiana's implementation plan also incorporates by reference EPA's new source performance standards, including the 20% opacity limitation of 40 C.F.R. § 60.302(c)(4).

*See id.* § 3003.

The Clean Air Act includes a citizen suit provision that allows citizens to request injunctive relief and civil penalties of up to $32,500 per violation per day, payable to the United States Treasury, for the violation of any "emission standard or limitation" under the Act. 42 U.S.C. § 7604(a); *see* 40 C.F.R. § 19.4. Citizen suits may be brought against any person "who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation" of "any emission standard or limitation" under the Clean Air Act. 42 U.S.C. § 7604(a)(1). Emissions standards or limitations include: (1) any condition or requirement of a permit promulgated under the Clean Air Act, including provisions of state implementation programs, and (2) new source performance standards promulgated under 42 U.S.C. § 7411. 42 U.S.C. § 7604(f); *Kentucky Res. Council,* 304 F.Supp.2d at 926. The Act also authorizes federal district courts to enforce emission standards or limitations and to impose appropriate civil penalties. 42 U.S.C. § 7604(a).

Louisiana law also contains a citizen suit provision that allows "any person having an interest, who is or may be adversely affected, [to] commence a civil action on his own behalf against any person whom he alleges to be in violation" of Title 30, Subtitle II of the Louisiana Revised Statutes, which governs environmental quality, and the regulations promulgated

thereunder, including the Louisiana SIP. La. Rev. Stat. Ann. § 30:2026(A)(1). The statute authorizes a court to grant temporary or permanent injunctive relief and to assess a civil penalty not to exceed ten thousand dollars for each day of the continued noncompliance. *Id.* § 30:20206(A)(2). The court may also award actual damages, costs, and attorneys fees to the prevailing party. *Id.* § 30:20206(A)(3). Like the citizen suit provision under the Clean Air Act, the Louisiana statute contains a notice provision that requires the plaintiff to give written notice of the violation to the Secretary of the LDEQ 30 days prior to commencing suit. *Id.* § 30:2026(B)(1).

## II.   FACTUAL BACKGROUND

The parties in this case are feuding neighbors with property next to each other on the Mississippi River in St. James Parish. Nucor is constructing a steel production facility that Zen-Noh has vigorously opposed. Zen-Noh was the first to bring the conflict between the parties into federal court. In 2009, Zen-Noh sought to enjoin the LDEQ from issuing air permits for a pig iron plant to Nucor. Then, in 2012, Zen-Noh sought to enjoin Nucor from constructing the first of two direct reduced iron plants under authority of other air permits issued by LDEQ to Nucor. Zen-Noh has also contested LDEQ actions granting Nucor permits for its steel plants and sued the EPA for objecting to, but

failing to revoke, Nucor's air permits.

Seizing the offensive, Nucor filed the complaint in this action alleging that Zen-Noh has itself run afoul of federal and state air quality laws in the operation of its grain elevator. On April 30, 2012, Nucor issued a notice letter to Zen-Noh, the LDEQ, and the EPA alleging violations of the CAA and the Louisiana SIP. Nucor filed its original complaint against Zen-Noh on July 3, 2012. That suit, Civil Action No. 12-1738, was consolidated with Zen-Noh's suit against Nucor under Civil Action No. 12-1011. Zen-Noh moved to dismiss the Nucor complaint.[10] Nucor then filed its 38-page, nine-count First Amended Complaint.[11] Relevant here are the allegations of Counts IV and VI of the Amended Complaint.

Count IV alleged that Method 9 opacity readings of Zen-Noh's ship and barge loading operations revealed "significant violations" of the 20% opacity standards found at 40 C.F.R. § 60.302(c)(4) and La. Admin. Code tit. 33:III, § 1311.C. Because Specific Condition No. 4 of the Air Permit issued to Zen-Noh by the LDEQ required Zen-Noh to comply with the new source performance standards for grain elevators, including Section 60.302(c)(4), Nucor also alleged a violation of the Air Permit. Similarly, Specific Condition No. 12 required Zen-Noh to comply

---

[10] R. Doc. 42.

[11] R. Doc. 46.

with the Louisiana SIP provisions governing particulate emissions, including Section 1311.C, so Nucor also alleged a violation of the Air Permit on that basis. Nucor further alleged that the violations of the Air Permit violated La. Rev. Stat. Ann. §§ 30:2055 and 2057, and that the violations of the Louisiana SIP provisions and emissions limits incorporated into the Air Permit violated Sections 110 and 113 of the CAA, 42 U.S.C. §§ 7411 and 7413.

Count VI and the supporting allegations focus on Zen-Noh's emissions of particulate matter with a diameter less than 10μ ("PM-10"). Nucor contends that Zen-Noh "overestimated the particulate control efficiency of several of its loading and unloading operations in its permit application upon which the current Air Permit is based and thus, underestimated both its potential and actual emissions."[12] Nucor alleges that "[t]o the extent that inaccurate emission factors were used in developing the permit, the actual emissions are likely to have exceeded the permitted emissions, especially with regard to maximum pound per hour (lb/hr) Air Permit limits from the ship loading operations and barge unloading operations during topping off."[13] Nucor alleges that these violations of the emissions limits in the Air Permit are also a violation of General Condition 1 of the Permit,

---

[12] R. Doc. 46 at 24.

[13] *Id.* at 33.

La. Admin. Code tit. 33:III, § 501, La. Rev. Stat. Ann. §§ 30:2055 and 2057, and Sections 110 and 113 of the CAA, 42 U.S.C. §§ 7411 and 7413.

The Court determined that Zen-Noh's motion to dismiss applied to Nucor's First Amended Complaint as well as its original complaint[14] and dismissed all but Counts IV and VI.[15] Zen-Noh now moves for summary judgment on the remaining claims. It argues that summary judgment should be granted on Count IV because Nucor has no expert testimony or other competent evidence to prove a violation of the opacity standards in 40 C.F.R. § 60.302(c)(4) and La. Admin. Code tit. 33:III, § 1311.C.[16] Nucor argues that the environmental consultants it engaged to conduct Method 9 observations should be able to testify as fact witnesses, and that their observations create a question of material fact as to whether Zen-Noh exceeded the 20% opacity limit.

Zen-Noh argues that summary judgment is also appropriate as to Count VI because Nucor has no expert opinion or other

---

[14] R. Doc. 101.

[15] R. Doc. 206.

[16] Nucor has since conceded that because La. Admin. Code tit. 33:III, § 1311.C permits opacity in excess of 20% for one six-minute period every sixty minutes, it cannot prove a violation of that provision, or, by extension, of Specific Condition No. 12 of Zen-Noh's Air Permit. However, Nucor maintains that it is able to demonstrate a violation of 40 C.F.R. § 60.302(c)(4), which contains no six-minute exception. R. Doc. 273 at 5.

competent evidence that actual (as opposed to potential) emissions of PM-10 violated the limits of the Air Permit. In response, Nucor has presented evidence that certain emissions sources exceeded their permitted hourly operating rates on numerous occasions.

## III. LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (internal quotation marks omitted).

If the dispositive issue is one on which the moving party

will bear the burden of proof at trial, the moving party "must come forward with evidence that would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991)(citation omitted). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324.

The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *Id.* at 325. *See also Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden

11

of proof at trial.'") (citing *Celotex*, 477 U.S. at 332).

## IV.   DISCUSSION

### A.   Count IV

In 2011, Nucor hired Environmental Resources Management
("ERM"), an environmental consulting firm, to observe the Zen-Noh
facility and conduct observations of the fugitive emissions
emanating from Zen-Noh's barge and ship loading operations. In
order to determine whether Zen-Noh was operating in violation of
the 20% opacity limitation for fugitive emissions set forth in §
40 C.F.R. 60.302(c)(4), a number of ERM employees underwent
training and testing to become certified Method 9 observers.
Method 9 is the reference method designated in 40 C.F.R. § 60.11
for use in determining compliance with the 20% opacity limitation
of 40 C.F.R. § 60.302(c)(4). After conducting a series of
observations in 2011, ERM was retained by Nucor's counsel in 2013
and began a second round of observations. In support of its
claim, Nucor seeks to introduce observation forms completed by
ERM employees Anna Migliore, Timothy Desselles, Kimberly
McIntyre, Stephen Mattison, and Sean Brennan. It also plans to
introduce the testimony of each of these individuals except
Brennan, who is no longer an ERM employee.

Summary judgment on Count IV is warranted for three reasons:
First, although Nucor claims to have evidence of thirteen

distinct opacity violations, it has produced evidence of only

four instances in which opacity is alleged to have exceeded 20%.

Second, because Nucor failed to designate the ERM observers as

experts and to furnish expert reports in accordance with the

Court's scheduling order, the observers will not be permitted to

testify regarding the four potential violations.  Finally, absent

the observation forms and observer testimony, Nucor lacks

competent evidence in support of its claim.

### 1.   Of the thirteen claimed violations, Nucor has competent evidence of only four potential violations.

Nucor alleges that the ERM employees observed emissions in

excess of 20% opacity on 13 occasions. However, Nucor's

Memorandum in Opposition identifies only six "potential

violations" in which opacity is alleged to have exceeded 20%.[17]

Nucor does not identify the remaining seven observations in its

memorandum[18] and advances a responsive argument that can apply to

---

[17] R. Doc. 273 at 9-11.

[18] Moreover, other than the six observation forms
specifically discussed in plaintiff's opposition memorandum,
plaintiff's Exhibit IV-1 contains only four additional
observation forms showing a potential opacity violation. R. Doc.
273-2. These observations took place on April 5, 2011, April 7,
2011, April 12, 2013, and April 20, 2013 and are mentioned
nowhere in Nucor's brief. Additionally, the report for April 7,
2011, clearly identifies the activity observed as barge
unloading, which Nucor concedes is not subject to the 20% opacity
limitation. R. Doc. 273 at 5; *see* 40 C.F.R. § 60.302(c)(4)
(setting a 20% opacity limit for barge and ship loading stations
only) and § 60.302(d) (governing barge and ship unloading).

only one of the seven.[19] Accordingly, Nucor has abandoned six of the thirteen alleged exceedances. *See Criner v. Texas--New Mexico Power Co.*, 470 F. App'x 364, 367-68 (5th Cir. 2012) (finding abandonment of one of plaintiff's theories of liability when plaintiff failed to address that theory in opposition to summary judgment). *See also* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record.").

Moreover, two of the six observations identified in Nucor's brief were conducted by former ERM employee Sean Brennan, who will not testify at trial. Zen-Noh argues that the observation forms, which constitute the only evidence of these potential violations, are inadmissible hearsay.  Nucor seeks to introduce

---

[19] In its motion for summary judgment, Zen-Noh identified three observation forms attached to Nucor's Answers to Zen-Noh's Second Set of Interrogatories that were the product of observations made during periods in which the observed equipment was starting up or shutting down. These observations took place on April 5, 2011, April 7, 2011, and April 9, 2013. Zen-Noh argued that because the opacity standards do not apply during periods of startup, shutdown, or malfunction ("SSM"), 40 C.F.R. 60.11(c), the observations could not serve as evidence of a violation. As discussed in note 18, the April 7, 2011, observation involved barge unloading, which is not subject to the 20% opacity limitation, and there is no observation report in Exhibit IV-1 corresponding to the April 9, 2013, observation. To the extent that Nucor's general objection to Zen-Noh's SSM defense may be construed as an argument in support of the April 5, 2011, observation, that alleged opacity exceedance remains on the table along with the six observations discussed in Nucor's opposition memorandum. For the reasons that follow, however, Nucor has no competent evidence in support of this or any alleged violation.

them under either Federal Rule of Evidence 803(6), the business records hearsay exception, or 803(1), the "present sense impression" exception.

Rule 803(6) requires that "neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E). Because of this concern for trustworthiness, it has long been the rule that the business records exception does not apply to records prepared in anticipation of litigation. *Palmer v. Hoffman*, 318 U.S. 109, 114 (1943); Broadcast *Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 238 (5th Cir. 1988). That ERM was hired first by Nucor and then by its attorneys in this matter solely to observe Zen-Noh's operations serves as a clear indication that the observation forms were prepared solely for the purpose of this litigation. The business records exception therefore does not apply.

Rule 803(1) creates a hearsay exception for "a statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." The rationale behind the exception is that when the event under consideration and the statement describing that event occur almost simultaneously, there is almost no "likelihood of [a] deliberate or conscious misrepresentation." *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 280 (5th Cir. 1991) (quoting Fed. R. Evid. 803(1) advisory committee's note).

That rationale clearly does not apply in this case. When a statement is made for a specific purpose such as litigation, it lacks the indicia of reliability that motivate the rule. *See United States v. Woods*, 301 F.3d 556, 562 (7th Cir. 2002)("A declarant who . . . provides statements for a particular reason creates the possibility that the statements are not contemporaneous, and, more likely, are calculated interpretations of events rather than near simultaneous perceptions."); *United States v. Orm Hieng*, 679 F.3d 1131 (9th Cir. 2012) (discounting "calculations *derived from* [the declarant's] observations" as "purposeful analysis of sense impressions" and excluding the statements as inadmissible hearsay)(emphasis in original). Accordingly, the present sense impression exception does not apply, and Brennan's observation forms are inadmissible.

The exclusion of Brennan's forms leaves only five forms that could potentially serve as evidence of a violation. Of those, Migliore's observation form dated June 28, 2011 clearly states that the activity observed was barge unloading,[20] which, as discussed *supra* in note 18, is not subject to the 20% opacity limitation. Nucor speculates in its brief that because the Control Room Activity Report indicates that a ship was present at Zen-Noh's facility at the time the observation occurred, it is possible that Migliore was actually watching the ship being

---

[20] R. Doc. 273-2 at 3.

loaded, rather than watching a barge (which the activity report indicates was also present) being loaded. If Nucor is suggesting that Migliore could not tell whether she was looking at a barge or a ship, then it is rather troubling that Nucor now seeks to base its claim on her ability to accurately conduct a Method 9 observation. Furthermore, the only evidence Nucor presents in support of this theory is the Control Room Activity Report,[21] which merely indicates that a ship was present at the facility. Nucor argues that while "the report does not indicate that a barge was being unloaded to the ship during the specific time period of the observation, the ship *could have been being* loaded from storage silos or shipping bins *as such activities are not shown on these reports*."[22] Such speculation, entirely unsupported by documentary evidence, will not suffice to withstand a motion for summary judgment.

> **2.   Because Nucor failed to designate the ERM observers as experts and to furnish expert reports in accordance with the Court's scheduling order, the observers will not be permitted to testify as to the contents of the observation forms.**

The only observation forms that could potentially support a finding of a violation are the April 5, 2011 form completed by Desselles, the March 19, 2013 form completed by Mattison, and the two observation forms completed by McIntyre on May 24, 2013. With

_____

[21] R. Doc. 273-3 at 1.

[22] R. Doc. 273 at 10 (emphasis added).

the exception of the form completed by Desselles (which, as discussed in note 19, *supra*, was not mentioned in Nucor's opposition to summary judgment), Zen-Noh did not receive any of these forms until its June 18, 2013 deposition of Migliore and Mattison, which was one day before it deposed Desselles and four days after the deadline for expert reports.[23] Zen-Noh did not even learn of McIntyre's existence until the day of the depositions and was unable to depose her in time for its expert to include an evaluation of her opacity readings in his own report, which was due July 15.[24] Nucor never submitted expert reports for any of the observers.

Zen-Noh has therefore moved to exclude the testimony of all four observers based on Nucor's failure to designate them as expert witnesses and to provide expert reports by the June 14 deadline established in this Court's scheduling order. Zen-Noh also claims that the observers are not qualified under Federal Rule of Evidence 702 to testify as experts on the issue of opacity violations.

In response, Nucor argues that the ERM employees are merely fact witnesses who will testify to the procedures they followed and to the information they observed and collected on the observation forms. Nucor contends that because the employees will

---

[23] R. Doc. 222-1 at 2-3.

[24] *Id.*

not testify as to the ultimate issue-that is, whether Zen-Noh is in violation of its Air Permit-they are not rendering an opinion requiring expert testimony. The plaintiff also argues that testimony regarding opacity observations is not expert testimony because performing the observations requires no expertise or specialized knowledge.

### a. The observers' proposed testimony qualifies as expert testimony.

Federal Rule of Evidence 701 governs the admissibility of opinion testimony by lay witnesses. It provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. In contrast, Federal Rule of Evidence 702 permits expert testimony "in the form of an opinion or otherwise" by any witness whose "knowledge, skill, experience, training, or education" qualifies him or her to provide such testimony and whose "scientific, technical, or other specialized knowledge" will assist the trier of fact. Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137

19

(1999), it clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science. Fed. R. Evid. 702 advisory committee's note. Rule 702 in its current form thus "affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony." Fed. R. Evid. 702 advisory committee's note.

After *Daubert* and *Kumho*, Rule 701 was amended to include the current provision forbidding lay witnesses from offering opinions based on scientific, technical, or other specialized knowledge. The Advisory Committee indicated that the purpose of the amendment was to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee's note.

Today, "*any* part of a witness's opinion that rests on scientific, technical, or specialized knowledge must be determined by reference to Rule 702, not Rule 701," *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008)(emphasis in original), and must comport with the corresponding disclosure requirements of the Civil and Criminal Rules. Fed. R. Evid. 701 advisory committee's note. Whether opinion testimony rests on scientific, technical, or other specialized knowledge turns on "whether the testimony falls within the realm of knowledge of the

average lay person." *United States v. Caldwell*, 586 F.3d 338, 348 (5th Cir. 2009). In other words, a person may testify as a lay witness only if his "opinions or inferences. . . could be reached by any ordinary person." *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 460 (5th Cir. 1996)(quoting *Brady v. Chemical Constr. Corp.*, 740 F.2d 195,200 (2d Cir. 1984)).

Method 9 is codified at 40 C.F.R. pt. 60, app. A. It includes procedures for the training and certification of qualified observers, as well as the procedures to be used by the observers to determine plume opacity. The EPA has issued a 63-page Quality Assurance Handbook to guide observers in conducting reliable observations.[25] It also published a 48-page Visible Emissions Field Manual to serve as a "simplified" observation guide derived from the numerous published technical guides, manuals, and reports on Method 9.[26]

The method requires observers to take opacity readings of plumes at 15-second intervals, measured in increments of five percent. The observer averages 24 consecutive readings to obtain the six-minute average of the plume's opacity. The method contains specifications regarding the observer's position in relation to the sun, his or her location and elevation in

---

[25] Envtl. Prot. Agency, Quality Assurance Handbook for Air Pollution Measurement Systems: Volume III: Stationary Source Specific Methods (1984). R. Doc. 265-2.

[26] Envtl. Prot. Agency, Visible Emissions Field Manual: EPA Methods 9 and 22 (1993). R. Doc. 238-1 at 5.

relation to the emission source, the angle of his or her line of vision to the plume direction, the point of observation within the plume, and the types of plumes that may be observed for purposes of determining compliance.

The appearance of a plume of smoke depends on a number of variables, some of which can be controlled by the observer, and others that must be taken into account by the properly trained observer when estimating plume opacity. Factors influencing plume opacity include particle density, particle refractive index, particle size distribution, particle color, plume background, pathlength, distance and relative elevation to stack exit, sun angle, luminous contrast and color contrast between the plume and the background against which the plume is viewed.[27]

To become certified in Method 9, an observer views a series of 25 white plumes and 25 black plumes emitted by a smoke generator designed and calibrated according to Method 9's specifications. Opacity of the plumes is randomized. The observer's level of error may not exceed 15% opacity for any one reading, and his or her average error must not exceed 7.5% opacity for each type of plume. Most observers attend a two-day training before taking the certification test, and observers must renew their certification every six months. The Quality Assurance Handbook indicates that "[p]roper application of Method 9 . . .

---

[27] *Id.* at 9.

often involves a number of administrative and technical procedural steps not specifically addressed in the *Federal Register* method. Experience has shown these steps are necessary to lay a proper foundation for any subsequent enforcement action."[28] The Handbook also identifies 11 "special observation problems" that may make it "difficult or impossible to conduct a technically defensible visible emissions observation," including the presence of multiple plumes or emissions sources, wind and background conditions, factors affecting visibility such as humidity and fog, and the presence of water vapor in the plume.[29]

Given the certification requirements and the overall complexity of the procedures for obtaining "technically defensible" opacity observations, there is simply no question that the observers' statements concerning the opacity of the emissions they observed are based on precisely the type of "technical or specialized knowledge" that Rule 701 contemplates. Nor can it be said that the myriad factors affecting the observed opacity of dust emissions are within the realm of knowledge of the average lay person. *Cf. Doddy*, 101 F.3d at 459-60 (determining that witness' claim of personal knowledge of

---

[28] R. Doc. 265-2 at 8.

[29] *Id.* at 32-36. The last factor is of particular importance given the deposition testimony of Zen-Noh's shift foremen, which revealed the frequent use of water cannons, sprinkler systems, and foggers, which blow a fine mist into the dust cloud, to help control emissions. *See* R. Doc. 273-8 at 42-47; R.Doc. 273-9 at 38.

presence of toxic chemicals in oil well could not be made by an
ordinary person or in the absence of specialized training or
expertise). Plaintiffs have cited no cases that would support
their position, and indeed, the cases discussing the testimony of
Method 9 observers all involve witnesses who were designated as
experts. *See Lloyd A. Fry Roofing Co. v. State*, 524 S.W.2d 313,
320 (Tex. Civ. App. 1975); *City of Cleveland v. Cleveland Elec.
Illuminating Co.*, 448 N.E.2d 130, 133 (Ohio 1983); *State ex rel.
Fisher v. Cleveland Trinidad Paving Co.*, No. 65889, 1994 WL
463810 (Ohio Ct. App. Aug. 25, 1994). *See also United States v.
Comunidades Unidas Contra La Contaminacion*, 106 F.Supp.2d 216,
222-23 (D.P.R. 2000) (referring to question of plant's compliance
with opacity limit as "highly technical and specific," and to EPA
officials who determined proper observation point within plumes
as experts). One scholar devoted the bulk of her article on the
admissibility of scientific evidence in environmental litigation
to conducting a *Daubert* analysis of Method 9, without giving a
passing nod to the notion that a Method 9 observer could pass for
a fact witness. *See* Susan Norton, *Factors for Determining
Validity of Evidence in Clean Air Act Litigation*, 15 J. Land Use
& Envtl. L. 235 (2000).

That a Method 9 observer could be characterized as a fact
witness is even less plausible in a case such as this one, in
which the observers are not EPA or LDEQ officials but rather paid

consultants who underwent training and certification and
conducted Method 9 observations exclusively for the purposes of
this litigation. Nucor came close to acknowledging this in its
response to Zen-Noh's first motion for partial summary judgment,
filed on January 15, 2013.[30] After Zen-Noh raised the same
argument that it makes now—namely, that Nucor had no competent
evidence of opacity violations because it failed to identify the
observers as expert witnesses in accordance with the original
scheduling order—Nucor did not contend that the observers were
not experts. Rather, it merely argued that the exclusion of any
evidence "not properly designated or submitted pursuant to the
scheduling order" was not warranted in light of the parties'
prior agreement to request an amended scheduling order.[31]

　　　Based on the factors discussed above, the Court concludes
that Nucor should have disclosed the observers as expert
witnesses and furnished Zen-Noh with expert reports by the June
14 deadline established in the scheduling order.

> **b.** **The appropriate sanction for Nucor's failure
>         to designate the observers as experts is
>         exclusion of their testimony.**

--------------------------------------------------------

[30] R. Doc. 75. This motion, along with Zen-Noh's first
motion in limine to exclude the observers' testimony, R. Doc. 74,
were mooted by the Court's grant of Nucor's motion to continue
the March 4, 2013 trial date and to amend the initial scheduling
order.

[31] R. Doc. 86 at 9.

Federal Rule of Civil Procedure 16(b) authorizes district courts to control and expedite the discovery process through a scheduling order. *See* Fed. R. Civ. P. 16(b). Consistent with this authority, the Court has "broad discretion" to enforce its scheduling order. *See Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir. 1990) ("[O]ur court gives the trial court 'broad discretion to preserve the integrity and purpose of the pretrial order.'") (quoting *Hodges v. United States*, 597 F.2d 1014, 1018 (5th Cir. 1979)). The Federal Rules of Civil procedure specifically authorize the Court to sanction a party for failing to comply with its scheduling order by excluding evidence. *See* Fed. R. Civ. P. 16(f), 37(b)(2).

In *Geiserman*, the Fifth Circuit listed four factors that a court should consider in exercising its discretion to exclude evidence: (1) a party's explanation for its failure to timely identify its witnesses and exhibits; (2) the importance of the proposed evidence; (3) potential prejudice in allowing the admission of the exhibits or testimony; and (4) the availability of a continuance to cure such prejudice. 893 F.2d at 790. *See also Betzel v. State Farm Lloyds*, 480 F.3d 704, 707 (5th Cir. 2007). The Court now addresses each factor in turn and concludes that exclusion of the ERM employees' testimony is warranted.

> i.   *Nucor's explanation for its failure to designate the ERM employees as experts:*

26

Nucor gives no reasons for its failure to comply with the scheduling order other than its dogged insistence that the observers are not experts. Rather than providing evidence to support this position, Nucor relied on its own conclusory representations that opacity observations "do[] not require any expertise or other specialized knowledge" and that "the industry views the observations as a non-expert task . . . ." Nucor's argument defies reason given the certification requirements and the hundreds of pages that have been written on conducting Method 9 observations capable of supporting an enforcement action.

Nucor was aware of Zen-Noh's position that the ERM observers should be designated as experts, and it had five months from the time that position was made known to furnish expert reports from the ERM employees. Instead of doing so, Nucor chose to take its chances, presumably in an attempt to avoid the scrutiny that precedes the admission of expert testimony. Accordingly, this factor weighs in favor of exclusion.

> *ii.  The importance of the proposed evidence:*

There is no question that the testimony of the ERM employees is vital to Nucor's claim that Zen-Noh violated the 20% opacity limit. The Fifth Circuit has previously interpreted a finding of importance to weigh in favor of exclusion, as it is arguably even more important that a plaintiff comply with scheduling orders and the Federal Rules' disclosure requirements when the evidence is

materially prejudicial to the defendant's case. *See Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 381 (5th Cir. 1996); Geiserman, 893 F.3d at 791. In its latest discussion of this factor, however, the Court held that, while not dispositive, the importance of the evidence to the plaintiff's case weighs in favor of admitting the testimony. *Betzel*, 480 F.3d at 707-08.

The Court in *Betzel* acknowledges, however, that "[t]he importance of such proposed testimony cannot singularly override the enforcement of local rules and scheduling orders." *Id.* at 708 (quoting *Geiserman*, 893 F.2d at 792). Since *Betzel*, the Fifth Circuit has routinely upheld the exclusion of important or even vital testimony where other considerations weigh in favor of exclusion. *See Garza v. Allstate Texas Lloyd's Co.*, 284 F.App'x 110, 112-13 (5th Cir. 2008) (upholding exclusion of expert testimony, although proffered testimony was the only evidence of damages to foundation of plaintiff's home); *Guidry v. Georgia Gulf Lake Charles L.L.C.*, 479 F. App'x 642, 644 (5th Cir. 2012) (affirming the exclusion of plaintiff's experts without which the plaintiffs "could not prove their case"); *Borden v. United States*, --- F.App'x ---, No. 12-10903, 2013 WL 3971458, at *2-3 (5th Cir. Aug. 5, 2013) (upholding district court's refusal to extend expert designation deadline although plaintiff's lack of expert testimony was fatal to her claim).

Though the testimony is important to Nucor's claim, it is also important to recall that Count IV is but one of nine claims originally brought in this action. That Nucor's other eight claims are also deficient does not elevate the significance of this testimony by default. Because other factors weigh in favor of exclusion, the significance of the testimony to one of the numerous allegations lodged against the defendant does not militate in favor of admission.

### iii. Prejudice to the defendant:

With the exception of the April 5, 2011 observation form completed by Timothy Desselles, Zen-Noh did not receive any of the observation forms that could potentially support a finding of a violation until the day it deposed Migliore and Mattison, which was four days after the deadline for expert reports. Of the three other observation forms that could potentially support a finding of a violation, two were completed by Kimberly McIntyre. Zen-Noh did not learn of McIntyre's existence until the day of the depositions and was unable to depose her in time for its expert to include an evaluation of her opacity readings in his own report, which was due July 15.

This Court has found prejudice when a party submitted its expert report as few as three days late, leaving the opposing party with less than a month before the close of discovery to depose the expert, hire its own expert, and obtain a written

report from him. *See Joshua v. State Farm Fire and Cas. Co.*,
CIV.A. 06-8603, 2008 WL 145095, at *3 (E.D. La. Jan. 14, 2008)
(Barbier, J.) (citing *Standard Servs. Co. v. Witex USA, Inc.*,
CIV.A. 02-537, 2003 WL 2004442, at *3 (E.D. La. Apr. 30, 2003).
In this case, the discovery deadline has long since passed, and
no expert reports were ever provided.

Moreover, the Fifth Circuit in *Betzel* expressed its
continued receptiveness to assertions that allowing the late
designation of experts would increase the defendant's litigation
expenses because the defendant had already prepared its motion
for summary judgment in reliance on the plaintiff's lack of
expert testimony. *See Betzel*, 480 F.3d at 708 (citing *Geiserman*,
893 F.2d at 791-93). In *Betzel*, the defendant's argument to that
effect was rejected only because its motion for summary judgment
"trivially relied on Betzel's lack of expert testimony." *Id.*

In contrast, Zen-Noh relies heavily on the inadmissibility
of the expert testimony. In *Betzel*, "[o]nly four sentences of
[the defendant's] motion for summary judgment [were] dedicated to
the argument that Betzel ha[d] 'no evidence' on his breach of
contract claim." *Id.* The remainder of the motion was dedicated to
an entirely separate legal argument that would independently
dispose of the claim. *Id.* In the present action, Zen-Noh leads
with the argument that Nucor lacks an expert opinion to prove an
opacity violation and argues only in the alternative that the

observation forms do not prove a violation. Zen-Noh also
dedicated four separate motions to excluding the testimony of the
four observers based on their designation as fact witnesses and
Nucor's failure to furnish expert reports. These facts alone
demonstrate sufficient prejudice should the testimony be admitted
for this factor to weigh in favor of exclusion.[32]

> *iv. Availability of a continuance to cure the prejudice:*

The Fifth Circuit has "emphasized that a continuance is the
preferred means of dealing with a party's attempt to designate a
witness out of time." *Betzel*, 480 F.3d at 708. Nucor, however,
has made no such attempt. Nucor does not seek to designate the
ERM observers as experts at all; rather, it refuses to
acknowledge that it cannot base its entire opacity claim on the
testimony of Method 9-certified consultants hired for the express
purpose of litigation without first undergoing the scrutiny that
Rule 702 requires. In fact, Nucor has not even requested a
continuance in the event that this Court finds the observers were
improperly designated.

---

[32] Even if the prejudice to the defendant were not great, "a
district court still has the discretion to control pretrial
discovery and sanction a party's failure to follow a scheduling
order." Exclusion is "particularly appropriate . . . where the
defendants have failed to provide an adequate explanation for
their failure to identify their expert within the designated
timetable." *1488, Inc. v. Philsec Inv. Corp.*, 939 F.2d 1281,
1288-89 (5th Cir. 1991).

Moreover, the Fifth Circuit acknowledges the propriety of exclusion even when "[a] continuance might have cured any prejudice arising from the defendants' late designation, [if] such a remedy would have entailed additional expense to the [defendant]. . . ." *1488, Inc.*, 939 F.2d at 1289. It has further observed that "a continuance would not deter future dilatory behavior, nor serve to enforce local rules or court imposed scheduling orders." *Betzel*, 480 F.3d at 709 (quoting *1488, Inc.*, 939 F.2d at 1288); *see also Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 573 (5th Cir. 1996) (noting that a continuance "would neither punish [the plaintiff] for its conduct nor deter similar behavior in the future") (quoting *Bradley v. United States*, 866 F.2d 120, 126 (5th Cir. 1989)).

The scheduling order in this case set a hard deadline for the disclosure of expert witnesses and their reports and stated that "[t]he Court will not permit any witness, expert or fact, to testify or any exhibits to be used unless there has been compliance with this Order as it pertains to the witness and/or exhibits, without an order to do so issued on motion for good cause shown."[33] The pretrial notice that accompanied the order further emphasized that "[e]xpert witnesses whose reports have not been furnished opposing counsel shall not be permitted to

---

[33] R. Doc. 137 at 2.

testify . . . ." and that "[e]xcept for good cause shown, the Court will not permit any witness to testify unless with respect to such witness there has been complete compliance with all provisions of the pre-trial order and prior court orders."[34] Good cause exists only when the schedule "cannot be reasonably met despite the diligence of the party" that failed to comply. *Borden*, 2013 WL 3971458 at *3 (quoting Fed. R. Civ. P. 16(b) advisory committee's note (1983)).

This Court already granted Nucor a six month continuance, over Zen-Noh's objection, after Zen-Noh had filed a motion in limine and motion for partial summary judgment raising the exact argument that it raises now: that no competent evidence of opacity violations existed because Nucor failed to designate the observers as expert witnesses and had not provided expert reports in accordance with the original scheduling order. As previously discussed, this means that Nucor was already on notice that Zen-Noh viewed the observers as experts and fully intended to seek exclusion of their testimony if they were not designated as such.

In light of these facts, Nucor obviously had plenty of time to meet the expert deadlines after the Court granted a continuance. That it chose not to do so and took the untenable position that these individuals were fact witnesses suggests that

---

[34] R. Doc. 137-1 at 7.

Nucor was seeking nothing more than to avoid Rule 702 scrutiny. The risks that scrutiny posed for Nucor are palpable. This follows because numerous factors undermine the reliability of the proposed testimony. First and foremost, Method 9 was designed to test the opacity of emissions from stationary sources such as rectangular smoke stacks, not clouds of grain dust thrown into the air by ship loading operations. The method is known to have an error rate of up to 7.5% when observing stationary source emissions under relatively ideal conditions.[35] In contrast, the grain dust that permeates the air during ship loading operations would be considered a type of fugitive emissions, which are "those emissions that do not emanate from a conventional smoke stack or vent."[36] The Quality Assurance Handbook counts the observation of fugitive emissions among the "special observation problems" that may make it "difficult or impossible to conduct a technically defensible visible emissions observation."[37] Though the handbook does recommend minor adjustments to ensure the accuracy of fugitive emissions observations, the Court is not aware of any tests indicating the accuracy of Method 9 when used to observe fugitive as opposed to stationary source emissions.

---

[35] Visible Emissions Field Manual, EPA Methods 9 and 22, R. Doc. 238-1 at 10.

[36] EPA, Quality Assurance Handbook for Air Pollution Management Systems: Volume III. Stationary Source Specific Methods, R. Doc. 265-2 at 35.

[37] *Id.* at 32, 35.

Also of concern is that the observations were performed not by EPA or LDEQ officials but by consultants hired, trained, and certified in Method 9 for the purposes of this litigation.[38] *See* Fed. R. Evid. 702 advisory committee's note (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (evaluating whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying," in determining whether the testimony is sufficiently reliable to be considered by the trier of fact)). Compounding these concerns, Nucor hangs its hat on the observations of the ERM employees when it cannot even say with certainty what type of activities they were observing.[39]

By choosing not to designate the observers as experts and to furnish expert reports, Nucor was at best engaging in dilatory tactics and at worst trying to avoid the scrutiny of Rule 702 altogether. The Court will not reward such behavior with a continuance. To do so would not deter Nucor from future attempts

---

[38] The EPA's Quality Assurance Handbook for Air Pollution Measurement Systems recommends independent audits of observers in their first year and notes that "routine [quality assurance] checks for proper observer positioning and documentation are necessary to obtain good quality data." R. Doc. 265-2 at 47. There is no indication that the observations of any ERM employee were ever audited or supervised in any way.

[39] *See* discussion *supra* p. 16.

to dress its experts in laymen's clothing in order to prevent the Court from performing its important gatekeeping function with respect to expert testimony. See Fed. R. Evid. 701, advisory committee's note (observing that the language of Rule 701 "ensures that a party will not evade the expert witness disclosure requirements set forth in Fed.R.Civ.P. 26 . . . by simply calling an expert witness in the guise of a layperson," and urging courts to "be vigilant to preclude manipulative conduct designed to thwart the expert disclosure and discovery process.") (quoting Joseph, Emerging Expert Issues Under the 1993 Disclosure Amendments to the Federal Rules of Civil Procedure, 164 F.R.D. 97, 108 (1996)). For all these reasons, the Court determines that exclusion of the ERM employees' testimony is appropriate.

### 3. Nucor has no other competent evidence in support of Count IV.

Exclusion of the observers' testimony leaves the observation forms as the only evidence of their observations, but they, like the forms completed by Sean Brennan, are inadmissible hearsay and cannot serve as competent evidence capable of precluding summary judgment.

The only other evidence Nucor provides in support of Count IV is a collection of dock foreman shift reports, along with the deposition testimony of some of the foremen, describing the sometimes dusty conditions of Zen-Noh's loading and unloading

operations. Nucor does not contend that the reports and testimony are independent evidence of opacity violations; rather, it asserts that the documents "corroborate" the ERM employee's opacity observations.[40] Irrespective of their purpose, the reports cannot alone create an issue of material fact as to Count IV.

The Credible Evidence Revisions to 40 C.F.R. Part 60, promulgated by the EPA in 1997, clarified that evidence other than reference tests such as Method 9 could be used to demonstrate compliance, or the lack thereof, with emissions limits such as the 20% opacity standard of 40 C.F.R. § 60.302(c)(4). However, the revisions make clear that Method 9 "remains the benchmark against which other emissions or parametric data, engineering analyses, or other information will be evaluated." Notice of Final Rulemaking, 62 Fed. Reg. 8314, 8317 (Feb. 24, 1997). Ultimately, to qualify as "credible evidence," the proffered data must be "relevant to whether a source would have been in compliance with applicable requirements if [Method 9] had been performed." Id. (quoting 40 C.F.R. § 60.11(g)). The discussion of § 60.11(g) concludes by stating that "other *emissions or parametric data, or engineering analyses*, may be considered if relevant to the results that would have been

---

[40] R. Doc. 273 at 17.

obtained by the appropriate, properly conducted reference test methods." *Id.* (emphasis added).

Zen-Noh argues that the foreman shift reports are poor evidence of opacity violations because they exist only to inform supervisors that equipment was slowed down by the foremen in response to dusty conditions, and to indicate to the next shift's employees that dust has accumulated on equipment and needs to be cleaned up.[41] Whether or not that is the case, it is clear that comments on equipment conditions made by shift foremen are not the type of "emissions or parametric data, or engineering analyses" permitted under the credible evidence rule. While the reports may be cause for concern that Zen-Noh's equipment is not up to par, they are not enough, standing alone, to spare Count IV from summary judgment. Accordingly, this Court holds that Nucor has failed to produce competent evidence capable of demonstrating a genuine issue of material fact as to Count IV and grants summary judgment against them on that Count.

**B.    Count VI**

Count VI alleges that Zen-Noh used inaccurate emissions factors in developing its Air Permit, and as a consequence, its actual emissions exceed the permitted emissions.

---

[41] R. Doc. 258-2 at 6-7.

38

Nucor issued a notice of intent to sue on April 30, 2012.[42] The notice letter alleged violations corresponding to Counts I-VI in the First Amended Complaint. The relevant part of the letter for Count VI of the First Amended Complaint alleged that Zen-Noh had overestimated the particulate control efficiency of several of its loading and unloading operations in the permit application upon which the current permit was based. Nucor also alleged that Zen-Noh had utilized emissions factors[43] published by the EPA that A) did not apply to Zen-Noh's ship loaders and barge unloader (abbreviated as "SHIPLDR" and "B-UNLDR" in Nucor's Memorandum in Opposition), and B) were significantly revised shortly after Zen-Noh's permit was issued, demonstrating the inaccuracy of Zen-Noh's calculations. The notice letter concludes:

> To the extent that inaccurate emission factors were used in developing the permit, the actual emissions are likely to have exceeded the permitted emissions, especially with regard to the maximum lb/hr. limits for the Ship loading operations and barge unloading operations during topping off. Upon information and belief, Zen-Noh's actual emissions exceed the following permit limits:

---

[42] R. Doc. 46-1.

[43] An emissions factor is a representative value that attempts to relate the quantity of a pollutant released to the atmosphere with an activity associated with the release of that pollutant. *See* Emissions Factors and AP 42, *Compilation of Air Pollutant Emissions Factors*, EPA.gov, http://www.epa.gov/ttnchie1/ap42/ (last visited September 24, 2013).

| Source Identification | Maximum lb/hr limit PM10 | Average lb/hr limit PM10 | TPY limit PM10 |
|---|---|---|---|
| SHIPLDR1 | 7.10 | 6.4 | 10.84 |
| SHIPLDR2 | 7.10 | 6.4 | 10.84 |
| SHIPLDR3 | 7.10 | 6.4 | 10.84 |
| SHIPLDR4 | 7.10 | 6.4 | 10.84 |
| B-UNLDR | 1.9 | 1.8 | 1.9[44] |

Count VI survived Zen-Noh's motion to dismiss because Nucor alleged that actual emissions of PM-10 exceeded permit limits, based on information provided by Zen-Noh in its permit application, "corrected to utilize appropriate emission factors, capture efficiencies, and control efficiencies . . . ."[45] In its motion for summary judgment, Zen-Noh argues that Nucor "[n]ever made any of these 'corrections' and never determined actual emissions from any of the sources at the Elevator."[46]

In response, Nucor abandoned its argument that Zen-Noh used inaccurate control efficiencies or emissions factors for the

---

[44] R. Doc. 46-1 at 7. Based on the information contained in the permit, this number should actually be 7.98, not 1.9.

[45] R. Doc. 206 at 38 (quoting R. Doc. 46 at 17).

[46] R. Doc. 225-1 at 15-16.

barge loader and ship loaders 1-4. Instead, it now claims that
Zen-Noh's Control Room Activity Reports and monthly "EMC" reports
indicate that Zen-Noh's barge unloader, dust filters 5 and 6,
truck unloading hopper, and rail unloading hopper exceeded the
maximum operating rates[47] listed for them in Zen-Noh's permit
application. Zen-Noh objects to Nucor's new theory as "too late"
and argues that it impermissibly contradicts prior deposition
testimony of Jeff Braun indicating that the company had no
evidence of "actual emissions" violations.[48] The Court need not
decide whether the new allegations contradict Braun's testimony,
as they are outside the scope of the notice provided to defendant
in accordance the CAA and Louisiana citizen suit provisions.

In general, a plaintiff must provide specific notice of
intent to sue at least 60 days before filing a citizen suit. *See
Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989). Under the
Clean Air Act's citizen suit provision, at least 60 days before
filing suit, the citizen plaintiff must give "notice of the
violation (i) to the Administrator, (ii) to the State in which
the violation occurs, and (iii) to any alleged violator of the
standard, limitation, or order" allegedly violated. 42 U.S.C. §
7604(b)(1)(A). The notice must contain:

---

[47] The operating rate is the rate at which grain or grain
product is channeled through a piece of equipment, such as a
barge or ship loader. This is also known as "throughput."

[48] R. Doc. 258-2 at 7-10.

> sufficient information to permit the recipient to
> identify the specific standard, limitation, or order
> which has allegedly been violated, the activity alleged
> to be in violation, the person or persons responsible
> for the alleged violation, the location of the alleged
> violation, the date or dates of such violation, and the
> full name and address of the person giving the notice.

40 C.F.R. § 54.3(b). Although "the notice requirement does not demand that a citizen plaintiff "list every specific aspect or detail of every alleged violation," it must provide enough information to permit the defendant to identify the standards allegedly violated and the relevant activities with the degree of specificity required by the regulations. *Nat'l Parks & Conservation Ass'n v. Tennessee Valley Auth.*, 502 F.3d 1316, 1329 (11th Cir. 2007). "The notice requirements are strictly construed to give the alleged violator the opportunity to correct the problem before a lawsuit is filed." *Id.* (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, Inc., 484 U.S. 49, 60 (1987)).[49]

As an initial matter, the allegations in Nucor's Memorandum in Opposition relate to five different emissions sources, only one of which—the barge unloader—was named in the notice letter. Nucor failed to provide any notice whatsoever of potential

---

[49] Nucor also brings this suit under Louisiana's citizen suit provision, discussed *supra*. The Court has found no cases discussing the specificity required by that notice provision. Accordingly, recognizing the common structure and purpose of the two provisions, the Court construes the Louisiana provision to require a comparable level of specificity when providing notice to the secretary of the LEDQ and the potential defendant.

42

emissions violations originating from dust filters 5 and 6, the truck unloading hopper, and the rail unloading hopper. As previously noted, the notice letter states that "[u]pon information and belief, Zen-Noh's actual emissions exceed the following permit limits: . . ." thereby indicating that the limits listed were those about which Nucor intended to sue.

Zen-Noh lists 47 sources of PM-10 emissions in its permit application. They differ in function, operating rate, and annual hours of operation. The federal regulations make clear that a plaintiff must "identify the specific . . . limitation . . . which has allegedly been violated." 40 C.F.R. § 54.3(b) (2004). A claim that five out of forty-seven total emissions limits were exceeded and a general allegation of inaccuracies in the permit application do not serve as notice of alleged violations of four *different* permit limits originating from different emissions sources. *See Nat'l Parks & Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 502 F.3d 1316, 1329-30 (11th Cir. 2007)("The language of the regulation does not suggest that the notice may be good enough if it generally orients the agency or violator as to the type of violation . . . . [T]he recipient of the notice must understand from the notice what the citizen *is alleging*-not what the citizen could allege if the citizen knew more or cared about other possible transgressions.") (quoting *Karr v. Hefner*, 475 F.3d 1192, 1201 (10th Cir. 2007)); *cf. St. Bernard Citizens*

43

*for Envtl. Quality, Inc. v. Chalmette Ref., L.L.C.*, 500 F.Supp.2d 592, 609 (E.D. La. 2007) (finding notice requirement satisfied as long as subsequently alleged violations were "of the same type (same parameter, same outfall)"[50] as the violations included in the notice letter)(quoting *Pub. Interest Research Grp. of New Jersey, Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1250 (3d Cir. 1995)); *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 953 (9th Cir. 2002) (finding notice requirement satisfied "based on the fact that the violations *originated from the same source*, were of the same nature, and were easily identifiable . . . .") (emphasis added). For this reason, the Court determines that Nucor failed to provide adequate notice of the alleged violations of the permit limits associated with dust filters 5 and 6, the truck unloading hopper, and the rail unloading hopper.

Also problematic is that Nucor now relies on an entirely new theory of *how* Zen-Noh exceeded the permitted emissions limits: Nucor now argues that the sources in question violated the emissions limits by surpassing their maximum operating rates, when the notice letter alleged that the violations resulted from the use of inaccurate emissions factors and capture efficiencies.

---

[50] "Outfall" is a term used to describe emissions sources under the Clean Water Act. Though *St. Bernard Citizens* was a Clean Air Act case, it borrowed its reasoning and language from the Third Circuit's *Hercules* decision involving the Clean Water Act.

This defect applies not only to the four emissions sources not named in the original notice letter, but also to the barge unloader described in both the letter and Nucor's Memorandum in Opposition.

As 40 C.F.R. § 54.3(b) requires evidence of the "activity alleged to be in violation," it is difficult to see how allegations that Zen-Noh used improper emissions factors and control efficiencies could suffice as notice that the company actually exceeded the emissions limits through overuse of its grain handling equipment. "In practical terms, the notice must be sufficiently specific to inform the alleged violator about what it is doing wrong, *so that it will know what corrective actions will avert a lawsuit.*" *Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 996 (9th Cir. 2000) (quoting *Atlantic States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 819 (7th Cir.1997)) (emphasis added). By informing Zen-Noh that it had utilized improper emissions factors in its permit application, Nucor suggested that correcting its emissions factors would be the appropriate response going forward. The notice provided did not suggest, however, that the hourly throughput of the emissions sources was the problem.[51]

_____

[51] It is of no consequence that Zen-Noh was already in possession of the records forming the basis of Nucor's new theory of violations. *See Save Our Health Org. v. Recomp of Minn., Inc.,* 37 F.3d 1334, 1337-38 (8th Cir.1994) (complaint dismissed because plaintiff failed to include alleged violations in notice, even though defendant likely had independent knowledge of

Moreover, "[a]n important interconnection exists between the proper exercise of our jurisdiction over claims raised in a [Clean Air Act] citizen suit and the role of federal and state agencies in monitoring such suits." *ONRC Action v. Columbia Plywood, Inc*., 286 F.3d 1137, 1144 (9th Cir. 2002) (citing *Hallstrom,* 493 U.S. at 29). The purpose of the notice requirement is to avoid a lawsuit altogether by allowing agencies to step in, investigate, and bring the defendant into compliance. *Cmty. Ass'n for Restoration of the Env't*, 305 F.3d at 953. Had Nucor's notice letter alleged that Zen-Noh was exceeding some of the operating rates included in its permit application, either the LDEQ or the EPA "might well have decided that those theories had sufficient merit to call for agency action." *ONRC Action*, 286 F.3d at 1144.

Nucor suggests that it learned of the alleged operating rate exceedances only after a lengthy discovery battle. The Court does not grant summary judgment as to Count VI as punishment for Nucor's failure to allege violations about which it was not yet aware. Rather, the Court does so because the notice requirement of § 7604 is a strictly construed prerequisite designed to afford the alleged violator an opportunity to correct the violations before a lawsuit is filed, as well as to give state and federal agencies the opportunity to bring an enforcement action first.

---

violations, because provision of notice may have led to a quicker resolution of the claim); *Nat'l Parks & Conservation Ass'n, Inc.*, 502 F.3d at 1329-30 (same).

Until Zen-Noh has an opportunity to correct any possible violations outside the context of litigation, and until the EPA and LDEQ have the opportunity to evaluate these allegations and determine their own course of action, this Court cannot and will not determine if the alleged operating rate exceedances resulted in violations of the emissions limits of the permit.

## V. CONCLUSION

Accordingly, the Court grants Zen-Noh's motions to exclude the testimony of Timothy Desselles, Stephen Mattison, Kimberly McIntyre, and Anna Migliore. The Court also grants Zen-Noh's motion for summary judgment. Zen-Noh's motion to exclude the testimony of Bill Palermo and Don Elias is denied as moot, and Nucor's motion in limine to preclude Zen-Noh from introducing testimony or other evidence regarding Title V permitting issues or "potential to emit calculations" is also denied as moot.

New Orleans, Louisiana, this 4th day of November, 2013.

_Sarah Vance_
_____
SARAH S. VANCE

UNITED STATES DISTRICT JUDGE